**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- x

In re:                                :    Chapter 11

                                     :

CHAPARRAL ENERGY, INC., <u>et al.</u>,   :    Case No. 16-_____ (_____)

                                     :

              Debtors.[1]           :    Joint Administration Pending

                                     :

---------------------------------------------------------- x

**DECLARATION OF MARK A. FISCHER, CHIEF EXECUTIVE
OFFICER OF CHAPARRAL ENERGY, INC. IN SUPPORT
<u>OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS</u>**

Under 28 U.S.C. § 1764, Mark A. Fischer declares as follows under the penalty of perjury:

1.      I am the Chairman, Chief Executive Officer, and Co-Founder of Chaparral Energy, Inc. ("**<u>Chaparral</u>**"), which is incorporated in Delaware and is the parent corporation of the other debtors and debtors in possession (collectively, the "**<u>Debtors</u>**" or the "**<u>Company</u>**") in the above-captioned chapter 11 cases (collectively, the "**<u>Chapter 11 Cases</u>**").  I have served as Chief Executive Officer since 1988.  I am authorized to submit this declaration (the "**<u>First Day</u> <u>Declaration</u>**") on behalf of the Debtors.

2.      As Chief Executive Officer, I am responsible for overseeing the operations and financial activities of the Debtors, including but not limited to, monitoring cash flow, business relationships, workforce issues, and financial planning.  As a result of my tenure with the Debtors, my review of public and non-public documents, and my discussions with other members of the Debtors' management team, I am generally familiar with the Debtors'

---

[1]      The Debtors in these cases, along with the last four digits (or five digits, in cases in which multiple Debtors have the same last four digits) of each Debtor's federal tax identification number, are: CEI Acquisition, L.L.C. (1817); CEI Pipeline, L.L.C. (6877); Chaparral Biofuels, L.L.C. (1066); Chaparral CO2, L.L.C. (1656); Chaparral Energy, Inc. (90941); Chaparral Energy, L.L.C. (20941); Chaparral Exploration, L.L.C. (1968); Chaparral Real Estate, L.L.C. (1655); Chaparral Resources, L.L.C. (1710); Green Country Supply, Inc. (2723); and Roadrunner Drilling, L.L.C. (2399).  The Debtors' address is 701 Cedar Lake Blvd., Oklahoma City, OK 73114.

businesses, financial condition, policies and procedures, day-to-day operations, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisers that report to me in the ordinary course of my responsibilities.  I am authorized by each of the Debtors to submit this First Day Declaration.  References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.     On May 9, 2016 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  The Debtors will continue to operate their businesses and manage their properties as debtors in possession.

4.     I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief that were filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "**Bankruptcy Code**") and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").[2]  The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Cases on their businesses.  I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and to successfully maximize the value of the Debtors' estates.

---

[2]     Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

5.     Part I of this First Day Declaration provides an overview of the Debtors' businesses, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events leading to the Debtors' chapter 11 filings.  Part II sets forth the relevant facts in support of the First Day Pleadings.

## PART I

## II.     COMPANY AND BUSINESS OVERVIEW

6.     Chaparral Energy, L.L.C. ("**CELLC**")[3] was founded in 1988 and is headquartered in Oklahoma City.  The Company is a Mid-Continent independent oil and natural gas exploration and production ("**E&P**") company and has become a leading player in the liquids-rich Mississippi Lime and STACK plays,[4] which are home to multiple oil-rich reservoirs.  The Company is also the nation's third-largest carbon dioxide enhanced oil recovery ("**EOR**") producer based on number of active projects.  This position is underscored by the Company's activity in its North Burbank Unit in Osage County, Oklahoma, which is the largest oil recovery unit in the state.

### A.     Company History

7.     In 1988, Chairman and Chief Executive Officer Mark Fischer and Kitscotty Oil Company founded CELLC with the strategy of acquiring producing oil and gas properties.  Through the early 1990's, the Company grew its property base through acquisitions and began to capture additional profits through its oil and gas operations.  The Company's expansion was made possible by its talent for identifying, acquiring and unlocking the value of plays that other companies have written off as having "no remaining potential."  Because of these talents, the Company continued to expand through the 1990's by acquiring wells thought to

---

[3]     As discussed more fully below, CELLC is a wholly-owned direct subsidiary of Chaparral.

[4]     The "STACK" is an acronym for Sooner Trend, Anadarko, Canadian, and Kingfisher Counties.

be depleted with the goal of revitalizing production at such wells by focusing on secondary (water-flooding) and tertiary (carbon dioxide EOR) oil and gas recovery.

8.      In 1999, the Company began to actively build its EOR operations by seeking new opportunities to capitalize on undervalued oilfields through EOR and by acquiring an existing EOR project from Henry Petroleum in southern Oklahoma.  In 2000, the Company expanded its operations outside of Oklahoma and Texas by acquiring Bristol Resources Corporation in partnership with a third party capital provider.  The Company continued to expand its EOR operations throughout the 2000's by entering into the $CO_2$ transportation business and acquiring pipelines to facilitate its EOR operations.

9.      In the mid 2000's, the Company continued to grow and prosper through acquisitions and hedging.  In 2005, the Company bought out the Bristol Resource Partnership from its capital provider and, in 2006, the Company acquired Calumet Oil Company, which nearly doubled the Company's employee base and created a vast array of new exploration and production and EOR opportunities.  Despite a precipitous drop in oil prices in 2009, the Company's strong hedging program allowed it to continue to perform even as the economy declined.

10.     In 2010, Chaparral sold a 36% equity stake to a private equity firm, CCMP Capital Advisors, LLC to strengthen its balance sheet.  While the Company continued to acquire leases that offered significant upside potential, in 2011, it shifted the focus of its strategy from acquisitions to drilling and began exploring its first unconventional reservoirs using horizontal drilling and modern hydraulic fracturing technology.  This technology allowed the Company to access oil trapped in low-permeability rock formations to produce significant returns from plays that had been written off by competitors as non-viable.

4

11.    Beginning in 2012, the Company began transitioning to a pure mid-continent producer by selling its properties in Montana and North Dakota followed by additional property sales in 2013.    In 2014, the Company essentially completed the transition by selling properties in Arkansas, Louisiana, New Mexico, East Texas, South Texas, West Texas and certain of its properties in North Texas.    Today, the Company operates a midcontinent focused oil and gas enterprise, deriving its revenue directly or indirectly through sales of crude oil and natural gas through its E&P and EOR operations.

**B.    Overview of Operations and Revenues**

12.    The Debtors are involved in the acquisition, exploration, development, production and operation of oil and natural gas properties primarily in Oklahoma and Texas. The Debtors typically serve as the operator of wells in which they have a significant economic interest.    An "operator" is the party that is engaged in the production of oil or gas for a certain geographic unit, often established pursuant to state law, for the benefit of itself and other parties with mineral interests or leasehold interests in the same unit.[5]    As an operator, the Debtors conduct the day-to-day business of producing oil and gas at the site and initially cover the expenses incurred on behalf of the Debtors and the owners of working interests in a designated unit covered by a joint operating agreement, pooling order, or similar agreement.    The Debtors' most significant E&P operations are located in the STACK play in central Oklahoma with over 110,000 surface acres located within the play.    The Debtors' most significant EOR operations are in their North Burbank Unit in Osage County, Oklahoma, which is the single largest oil recovery

---

[5]    Additional background regarding the Debtors' operations is included in the *Motion of Debtors for Order Under 11 U.S.C. §§ 105(A), 363(B), 506(B), 1107(A), and 1108 and Fed. R. Bankr. P. 6003 Authorizing Payment of Certain (I) Operating Expenditures, (II) Joint Interest Billings, and (III) Warehousemen Claims* filed contemporaneously with this Declaration.

unit in the state and for which the Debtors serve as operator.  The Debtors additionally capture, compress and transport $CO_2$ from four separate $CO_2$ sources to their active EOR projects from pipelines and facilities owned and operated by the Debtors.  The Debtors own a significant portion of the oil field services equipment used for operating or maintaining wells on properties they operate.  In areas where the Debtors have oil and gas leases, but do not have the largest leasehold interest in the unit, another entity will typically operate the wells relating to the Debtors' oil and gas leases and distribute a portion of any sale proceeds to the Debtors.  These non-operating interests are significant to the Debtors and constitute about 25% of the Debtors' production.

13.    As of the Petition Date, the Debtors employed approximately 354 employees, consisting of approximately 173 located at their corporate headquarters in Oklahoma City, Oklahoma and 181 located in the field, who operate and maintain wells in which the Debtors serve as an operator.  None of the employees are party to any collective bargaining agreements.

14.    In 2015, the Debtors' average net daily production was 27.9 thousand barrels of oil equivalents (MBoepd) and the Debtors oil and natural gas revenues were $324.3 million, of which $255.4 million is attributable to oil sales, $45.6 million is attributable to natural gas sales, and $23.3 million is attributable to natural gas liquids sales.

**C.    Corporate Structure**

15.    The below table provides a summary of the Debtors and their primary operations:

| Debtor | Parent | Primary Operations |
|---|---|---|
| Chaparral Energy, Inc. | N/A | Parent and Holding company |

| Debtor | Parent | Primary Operations |
|---|---|---|
| Chaparral Energy, L.L.C. | Chaparral Energy, Inc. | Primary operating entity of the Debtors; Manages the majority of the Debtors' bank accounts; Owns various working interests and overriding royalty interests |
| CEI Acquisition, L.L.C. | Chaparral Energy, L.L.C. | Owns non-oil and gas assets |
| CEI Pipeline, L.L.C. | Chaparral Energy, Inc. | Regulated entity for the transportation of natural gas to an ethanol plant |
| Chaparral Biofuels, L.L.C. | Chaparral Energy, Inc. | Owns interest in an ethanol plant |
| Chaparral $CO_2$, L.L.C. | Chaparral Energy, Inc. | Owns various EOR units and pipelines and processing facilities related thereto |
| Chaparral Exploration, L.L.C. | Chaparral Energy, Inc. | Inactive; No assets |
| Chaparral Real Estate, L.L.C. | Chaparral Energy, Inc. | Owns the Debtors' corporate and field offices and all surface acreage relating to Debtors' wells |
| Chaparral Resources, L.L.C. | Chaparral Energy, Inc. | Owns various working interests |
| Green Country Supply, Inc. | Chaparral Energy, Inc. | Inactive; No assets |
| Roadrunner Drilling, L.L.C. | Chaparral Resources, L.L.C. | Owns certain of the Debtors' drilling rigs |

16.     Chaparral is a privately held company and, therefore, not listed on any public exchange.  As of March 25, 2016, Chaparral had 1,393,565 common shares outstanding consisting of six separate classes of common stock, including 29,285 unvested shares outstanding to employees.  The mechanics of the employee stock programs are described in further detail in the Workforce Obligations first day motion.

**D.     Competition**

17.     The oil and natural gas industry is highly competitive. The Debtors have encountered strong competition from other independent operators and from major oil and natural gas companies in acquiring properties, contracting for drilling and oil field services equipment, and securing trained personnel. There has also been substantial competition for capital available

for investment in the crude oil and natural gas industry.  Many of the Debtors' competitors have financial and technical resources and staffs substantially larger than the Debtors.  As a result, the Debtors have, at times, experienced difficulty acquiring desirable leases and properties to grow the Debtors' businesses.

**E.**    **Summary of Prepetition Debt**

18.    <u>Credit Agreement</u>. On April 12, 2010, the Debtors (other than Chaparral Biofuels, L.L.C.) entered into that certain Eighth Restated Credit Agreement (as amended, the "**Credit Agreement**"), which is a revolving credit facility (the "**Credit Facility**") provided by certain lender parties thereto (the "**Prepetition Lenders**") and guaranteed by Chaparral. Availability of funds under the Credit Facility is subject to a borrowing base, which is currently $550,000,000, and which is set by the banks semi-annually on May 1 and November 1 of each year.  The obligations arising under the Credit Agreement are secured by senior, first priority security interests in, and liens upon, a substantial portion of the Debtors' oil and natural gas properties.  On February 11, 2016, the Debtors borrowed $141.0 million under the Credit Facility, which represented substantially all the remaining undrawn amount that was available under the Credit Facility at that time, which funds were thereafter deposited into accounts with Arvest Bank.  As of the Petition Date, the cash balance in the Debtors' accounts with Arvest Bank was approximately $152,600,000.   As of the Petition Date, there is approximately $550,000,000 outstanding under the Credit Facility.

19.    <u>Unsecured Notes</u>. Chaparral has issued approximately $1.2 billion in unsecured notes pursuant to three indentures.  The Unsecured Notes (as defined below) have different interest rates and maturities, but rank equally in right of payment.  The Unsecured Notes are guaranteed by the other Debtors (other than Chaparral Biofuels, L.L.C.).  Interest on

the Unsecured Notes is payable semi-annually, and the principal is due upon maturity. Wilmington Savings Fund Society, FSB serves as indenture trustee for each of the Unsecured Notes.

20. *2020 Notes*. On September 16, 2010, Chaparral issued those certain 9.875% unsecured notes (the "**2020 Notes**" and the holders thereof, the "**2020 Noteholders**") due in 2020 in an aggregate principal amount of $300,000,000 pursuant to an Indenture (as amended, the "**2020 Indenture**"). Interest on the 2020 Notes is paid semi-annually on April 1 and October 1. The Debtors did not make the scheduled interest payment of approximately $14.8 million on April 1, 2016. As of the Petition Date, there is approximately $298,000,000 outstanding under the 2020 Notes.

21. *2021 Notes*. On February 22, 2011, Chaparral issued those certain 8.250% unsecured notes (the "**2021 Notes**" and the holders thereof, the "**2021 Noteholders**") due in 2021 in an aggregate principal amount of $400,000,000 pursuant to an Indenture (as amended, the "**2021 Indenture**"). Interest on the 2021 Notes is paid semi-annually on March 1 and September 1. The Debtors did not make the scheduled interest payment of approximately $16.5 million on March 1, 2016. As of the Petition Date, there is approximately $384,045,000 outstanding under the 2020 Notes.

22. *2021 Notes*. On May 2, 2012, Chaparral issued those certain 7.625% unsecured notes (the "**2022 Notes**" and the holders thereof, the "**2022 Noteholders**", and the 2022 Notes, together with the 2021 Notes and the 2020 Notes, the "**Unsecured Notes**" and the holders thereof, the "**Unsecured Noteholders**" and, the Unsecured Notes together with the Credit Facility, the "**Prepetition Loans**") due in 2022 in an aggregate principal amount of $550,000,000 pursuant to an Indenture (as amended, the "**2022 Indenture**", and, together with

the 2021 Indenture and the 2020 Indenture, the "**Indentures**").  Interest on the 2021 Notes is paid semi-annually on May 15 and November 15.  As of the Petition Date, there is approximately $525,910,000 outstanding under the 2020 Notes.

23.    Other Debt.  Chaparral Real Estate, L.L.C. is party to a mortgage agreement with Arvest Bank pursuant to which Chaparral Real Estate, L.L.C. issued a promissory note (the "**Mortgage Note**"), which is secured by substantially all of the real property owned by Chaparral Real Estate, L.L.C., to Arvest Bank in the principal amount of $13,159,790.53 at a 5.5% interest rate and maturing on December 31, 2028.    Interest on the Mortgage Note is payable monthly, and the principal is due upon maturity.  As of the Petition Date, there is approximately $10,046,000 outstanding under the Mortgage Note.

24.    The Debtors entered into lease financing agreements with U.S. Bank National Association for $24,500,000 through the sale and leaseback of compressors owned by the Debtors.  The Debtors are required to make lease payments monthly at varying rates described in the lease financing agreements such that the Debtors pay a minimum of $3,181,000 to U.S. Bank National Association annually.  The lease financing obligations are for 84-month terms and include the option to purchase the equipment for a specified price at 72 months as well as an option to purchase the equipment at the end of the lease term for its then-current fair market value.  As of the Petition Date, there is approximately $18,823,000 outstanding under the lease financing agreements.

25.    The Debtors also have obligations under a variety of installment notes secured by the Debtors' automobiles, machinery, and equipment.  Such obligations are payable at interest rates between 2.85% - 5.95% and have maturity dates from January 2016 to February

2018.   As of the Petition Date, there is approximately $1,338,000 outstanding under the installment notes.

26.   <u>Trade Debt</u>.  In the ordinary course of their businesses, the Debtors incur trade debt with numerous vendors in connection with their oil and gas production.  The Debtors believe that, as of the Petition Date, their unsecured trade debt is approximately $2.5 million in the aggregate on account of prepetition goods and services provided to the Debtors.

**F.    Summary of Hedging Arrangements**

27.   To provide partial protection against declines in oil and natural gas prices, the Debtors routinely enter into hedging arrangements ("**Hedges**") with certain counterparties (the "**Hedge Counterparties**"). The Debtors' decision on the quantity and price at which they choose to hedge their production is based upon their view of existing and forecasted production volumes, budgeted drilling projections, and current and future market conditions. Hedges typically take the form of oil and natural gas price collars, swap agreements, and purchased and sold puts. The Hedge Counterparties are also parties to the Credit Agreement.  As of March 31, 2016, the fair market value of the Debtors' Hedges was approximately $127,700,000.  Pursuant to the Credit Agreement, the Debtors may hedge up to a specified percentage of current production for periods of up to 66 months from the date on which the Hedge is entered.

**III.    EVENTS LEADING TO THE CHAPTER 11 FILINGS**

28.   Notwithstanding their positive market and competitive positions, beginning in late 2014, the Debtors began to experience significant revenue, cash flow, and liquidity challenges, due in large part to the recent collapse in the market price for crude oil and natural gas.  Crude oil prices decreased significantly in the latter part of 2014 and have remained low into 2016, reaching their lowest levels since 2003.  Declining revenues have made it increasingly difficult for the Debtors to continue to service their debts.

29.     <u>Current State of the Oil & Gas Industry and Impact on Debtors</u>.    The upstream oil and gas business is cyclical and commodity prices have remained low for an extended period.    The commodity price decline that began in mid-2014 has continued its declining trajectory into 2016, with the price per barrel of West Texas Intermediate ("**WTI**") oil falling below $30 on several occasions.    The depressed pricing environment has continued for longer than expected and has affected the Debtors just as it has affected the industry as a whole. The Debtors' average realized prices for 2015 decreased 49% for crude oil, 42% for natural gas and 57% for natural gas liquids as compared with 2014.    These low prices resulted in a reduction in the Debtors' capital spending program, had significant negative impacts on revenues, profitability, cash flows and proved reserves, resulted in asset impairments and caused the Debtors to significantly reduce their workforce.

30.     Even with Hedges in place, these challenges, among others, have caused a significant decline in the Debtors' financial health.    To illustrate, the Debtors' consolidated adjusted EBITDA decreased from approximately $455.2 million in calendar year 2014 to approximately $388.7 million in calendar year 2015.    In the same period, their revenue has declined from approximately $681.6 million to approximately $324.3 million, while net income has declined from approximately $209.3 million in 2014 to become a net *loss* of $1,333.8 million in 2015, primarily due to impairments to the value of the Debtors' oil and gas properties during 2015 as a result of depressed commodity prices.

31.     <u>The Debtors' Cost-Reduction Initiatives</u>.    The Debtors have taken a number of actions to reduce costs in 2015 and 2016 in response to declines in the industry as the Debtors have in the past. For example, in November 2014, Chaparral began implementation of a Company-wide effort to decrease its capital, operating and administrative costs.    Chaparral's cost

reduction initiatives included a reduction in its workforce which, in 2015, encompassed 213 employees, of which 131 were located in the Oklahoma City headquarters office and 82 were located at various field offices.  The Debtors have reduced their workforce by an additional 62 employees in 2016.

32.     The Debtors have also aggressively pursued price concessions from third-party service vendors.  The Debtors have achieved reductions of 35-40% on its drilling wells and achieved a target of $2.5 million to $3.0 million in drilling and completion costs per well as a result of these cost reductions from service providers and improved operational efficiencies. In a further effort to fully capture gains associated with improved vendor price concessions, the Debtors delayed completion operations on many of its newly drilled wells into the second half of 2015.  The Debtors have also significantly reduced its 2015 capital expenditures to $212 million compared to the amount spent in 2014 of $752 million and reduced its operated rig count from ten operated rigs as of December 2014 to one rig as of March 2016.  The Debtors further reduced their capital expenditure budget in 2016 to $111 million.

33.     Despite these cost-reduction initiatives, the Debtors still have a number of upcoming obligations that would have drastically reduce the Debtors' liquidity absent the filing of these Chapter 11 Cases.  The Debtors currently owe semi-annual interest payments to the 2021 Noteholders and the 2020 Noteholders in the amounts of $16.5 million and $14.8 million, respectively, on account of interest payments that were not made on March 1, 2016 and April 1, 2016, respectively.   The Debtors also have a semi-annual interest payment coming due to the 2022 Noteholders on May 15, 2016 in the approximate aggregate amount of $20.1 million, which is part of approximately $119.0 million in additional scheduled interest payments that the Debtors would incur on account of the Prepetition Loans over the next year.  Additionally, as a

result of depressed market prices, the Debtors anticipate that the lender-determined pricing that will be utilized to estimate their borrowing base under the Credit Agreement will be lower than the pricing utilized in the previous redetermination.  The Debtors expect that this will result in a significantly lower borrowing base at their next borrowing base redetermination, which was scheduled to occur around May 1, 2016.  In the event of a reduction in the borrowing base, the amount of outstanding borrowings under the Credit Facility in excess of the newly determined borrowing base would constitute a deficiency which the Debtors would have to repay in a single amount or in six equal monthly installments.

34.     The Debtors' Restructuring Efforts.  As a result of the Debtors' looming liquidity issues, since February, 2015, Chaparral's board of directors (the "**Board**") has actively pursued and examined a number of potential strategic alternatives without success.  These efforts included engaging advisors to assist the Debtors in their efforts to raise external capital from both debt and equity providers for the purpose of deleveraging the company through buying back outstanding Unsecured Notes at a discount.  After these efforts proved unsuccessful, Chaparral retained Latham & Watkins LLP ("**Latham**") on February 1, 2016, as counsel, and Evercore Group L.L.C. ("**Evercore**") on February 5, 2016, as financial advisor, to assist in the Debtors' restructuring efforts.

35.     In early February, the Company, with the assistance of its advisors, initiated a process to evaluate and consider various potential strategic and financial alternatives for the Debtors with a view to maximizing enterprise value, including, among other alternatives, a debt or equity financing, or a recapitalization.

36.     Certain third party financing sources, including selected parties involved in the Debtors' prior financing process, were contacted, at the Board's directive, on a

confidential basis, to solicit interest in a potential transaction with the Debtors.  The Debtors subsequently entered into confidentiality agreements with seven interested parties and provided such parties with access to a virtual data room and additional information to assist with their due diligence.  The proposals received by the Debtors were either not actionable, highly contingent and/or undervalued the Debtors' assets.

37.     After full consideration of the Debtors' potential strategic and financial alternatives (with the assistance of their management, Latham, and Evercore), the proposals submitted by potential investors, and follow-up discussions with certain potential investors, it became clear that there were no viable out-of-court restructuring options for the Debtors to pursue.

38.     In the months preceding the commencement of these cases, the Debtors continued to seek refinancing alternatives.  However, faced with a lack of viable financing options and the possibility of a borrowing base redetermination that could quickly decimate the Debtors' liquidity, the Board determined that the chapter 11 filings were necessary to preserve the Debtors' going concern value.

39.     After extensive discussions with their advisors, the Debtors determined that filing for chapter 11 was in their best interest and in the best interest of their creditors. Given the lack of alternatives and the fact that the vast majority of claims against the Debtors arise from the Credit Facility or the Unsecured Notes, the Debtors focused their restructuring efforts on discussions with the Prepetition Lenders and Unsecured Noteholders.  The Debtors' main goal in those discussions and in these Chapter 11 Cases is to restructure their balance sheet through a consensual plan of reorganization supported by their Prepetition Lenders and Unsecured Noteholders.

40.     To reach a consensual plan of reorganization, beginning in February 2016, the Debtors, with the assistance of their advisors, commenced extensive, good-faith discussions with the Prepetition Lenders and an ad hoc committee (the "**Ad Hoc Committee**") of noteholders collectively holding more than 50% of the Unsecured Notes outstanding regarding a potential in-court restructuring of the Debtors' obligations under the Credit Facility and the Unsecured Notes.  After the Prepetition Lenders' advisors and the Ad Hoc Committee's advisors commenced due diligence on the Debtors through information provided through an online data room, the Debtors commenced good-faith arm's-length negotiations regarding a potential restructuring of the Credit Facility and the Unsecured Notes that would materially delever the Debtors' balance sheet and allow the Debtors to retain substantial liquidity to continue to operate their businesses going forward.  In the course of these negotiations, the Debtors, the Prepetition Lenders, and the Ad Hoc Committee exchanged and considered, with the assistance of their respective advisors, numerous restructuring proposals.

41.     These negotiations continued even after the Debtors elected not to make an interest payment of $16.5 million due March 1, 2016, which started the 30-day grace period under the 2021 Indenture.  Unfortunately, no deal had been reached when the 30-day grace period expired.  The Debtors further elected not to make an interest payment of $14.8 million due April 1, 2016, which started the 30-day grace period under the 2020 Indenture.  Still no deal had been reached when the second 30-day grace period expired.  However, due to the progress that the Debtors, the Prepetition Lenders, and the Ad Hoc Committee made toward a potential restructuring, the Prepetition Lenders and the Ad Hoc Committee reached agreements (as amended, restated, modified, supplemented, or replaced from time to time, the "**Forbearance Agreements**") with the Debtors to forbear from exercising remedies on account of the missed

interest payments and certain other alleged defaults specified in the Forbearance Agreements through and including May 1, 2016.

42.     While the Debtors have been unable to reach a formal agreement with the Prepetition Lenders or the Ad Hoc Committee prior to commencing these Chapter 11 Cases, the Debtors will continue to negotiate in good-faith with the Prepetition Lenders and the Ad Hoc Committee to hopefully reach a consensual agreement with respect to the treatment of the Credit Facility and the Unsecured Notes.  As the Debtors are currently in default under the Credit Agreement and the Indentures and have been unable to obtain further forbearances from the Prepetition Lenders and the Ad Hoc Committee, the Debtors commenced these Chapter 11 Cases.

**PART II**

43.     In furtherance of the objective of a value-maximizing reorganization of the Debtors, the Debtors have sought approval of the First Day Pleadings and related orders (the "**Proposed Orders**"), and respectfully request that the Court consider entering the Proposed Orders granting such First Day Pleadings.  For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Pleadings.

44.     I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, Chapter 11 with minimum interruptions and

disruptions to their businesses or loss of productivity or value and (b) constitutes a critical element in the Debtors' being able to successfully maximize value for the benefit of their estates.

## I.    ADMINISTRATIVE AND PROCEDURAL PLEADINGS

### A.    Joint Administration Motion

45.    The Debtors seek the joint administration of their eleven (11) Chapter 11 Cases for procedural purposes only.  Many of the motions, hearings, and other matters involved in the Chapter 11 Cases will affect the Debtors.  Thus, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders, and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.

### B.    Retention Applications

46.    I believe that the retention of chapter 11 professionals is essential to the Chapter 11 Cases.  Accordingly, during these Chapter 11 Cases, the Debtors anticipate that they will request permission to retain, among others, the following professionals: (a) Latham & Watkins LLP, as co-counsel; (b) Richards, Layton & Finger, P.A., as co-counsel; (c) Kurtzman Carson Consultants LLC, as claims and noticing agent and administrative advisor; (d) Evercore Group, L.L.C., as financial advisor, (e) Ernst & Young LLP, as tax professionals; and (f) Opportune LLP, as restructuring advisor.  I believe that the above professionals are well-qualified to perform the services contemplated by their various retention applications, the services are necessary for the success of the Chapter 11 Cases, and the professionals will coordinate their services to avoid duplication of efforts.  I understand that the Debtors may find it necessary to seek retention of additional professionals as the Chapter 11 Cases progress.

## II.    BUSINESS OPERATION MOTIONS

### A.    Cash Management Motion

47.    In the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system, including maintenance of existing bank accounts, checks, and business forms; (ii) granting the Debtors a waiver of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with the Debtors' practices under their existing cash management system or other actions described therein; (iii) authorizing, but not directing, the Debtors to continue to maintain and use their existing deposit practices notwithstanding the provisions of Bankruptcy Code Section 345(b); (iv) authorizing, but not directing, the Debtors to continue certain ordinary course intercompany transactions; and (v) according superpriority status to postpetition intercompany claims arising from certain of such transactions.  The Debtors also request that the Court authorize and direct all banks with which the Debtors maintain accounts to continue to maintain, service, and administer such accounts and authorize third-party payroll and benefits administrators and providers to prepare and issue checks on behalf of the Debtors.

#### i.    The Debtors' Cash Management System and Bank Accounts

48.    In the ordinary course of their businesses, the Debtors maintain a complex cash management system (the "**Cash Management System**") that I believe is integral to the operation and administration of the Debtors' businesses.  The Cash Management System allows the Debtors to (i) monitor and control all of the Debtors' cash receipts and disbursements, (ii) identify the cash requirements of the Debtors, (iii) transfer cash as needed to respond to the cash requirements of the Debtors, and (iv) track intercompany cash transfers.

49.     The Cash Management System is managed by the Debtors at their headquarters in Oklahoma City, Oklahoma, where they oversee the administration of the various bank accounts to effect the collection, disbursement, and movement of cash.  I believe the Debtors' supervision of the Cash Management System enables the Debtors to, among other things, (i) accurately forecast and report their cash flow requirements and (ii) monitor the collection and disbursement of funds to and from the Debtor Bank Accounts (as defined below).

50.     I believe that the Cash Management System is organized in a way that respects the separate cash funding and operating needs of the Debtors.  A diagram depicting the Cash Management System is annexed as Attachment 1 to the Cash Management Motion.[6]  As of the Petition Date, it is my understanding that the Debtors maintain 19 bank accounts (the "**Debtor Bank Accounts**").  Of the Debtor Bank Accounts, 16 are held in the name of CELLC, two are held in the name of Chaparral Real Estate, L.L.C. ("**Chaparral Real Estate**"), and one is held in the name of CEI Pipeline, L.L.C. ("**CEI Pipeline**").  A detailed schedule of the Debtor Bank Accounts is annexed as Attachment 2 to the Cash Management Motion.

51.     <u>Cash Collection and Distribution Process</u>.  As described in Part I, the Debtors generate their cash deposits primarily through (i) their operations on oil and natural gas properties and (ii) through their rights under joint operating agreements, pooling agreements, unitization agreements, or similar agreements (collectively, "**Joint Operating Agreements**").  I understand that the Debtors' Joint Operating Agreements typically designate one party as the operator (an "**Operator**"), who conducts the day-to-day business of producing oil and gas at the site and initially covers the expenses incurred (the "**Operating Expenditures**") on behalf of

---

[6]     The Debtors also maintain a petty cash box at their headquarters in Oklahoma City, Oklahoma in which they hold approximately $1,000 primarily for the purpose of operating their on-site cafeteria.

itself and the other parties to a particular Joint Operating Agreement (the "**Non-Operators**" and each a "**Non-Operator**").

52.     It is my understanding that the Debtors receive payments on account of their operations on oil and natural gas properties into either the U.S. Bank Lock Box, if the payment is by check, or the Revenue Account, if the payment is received by an electronic transfer.  If the balance in the U.S. Bank Lock Box exceeds a certain minimum balance, the amount exceeding that minimum balance will be swept into the Revenue Account each week.

53.     It is my understanding that the Debtors also receive revenues on account of the Debtors' pro rata share of revenues under Joint Operating Agreements in which the Debtors are Non-Operators into either the Comerica Lock Box, if the payment is by check, or the Main Operating Account, if the payment is by electronic transfer.  If the balance in the Comerica Lock Box exceeds a certain minimum balance, the amount exceeding that minimum balance will be swept into the Main Operating Account each week.

54.     I understand that funds from the Revenue Account are distributed as necessary in the following manner:

(a) *Revenue Disbursement Account*: Revenue Account funds are swept on a daily basis into the Revenue Disbursement Account.  The Revenue Disbursement Account is used to make payments to owners of mineral interests and working interests for units which the Debtors serve as Operator for each party's share of oil and gas produced by the Debtors.

(b) *Transfer to Operating Disbursement Account*: To the extent that additional funds are needed that would normally be drawn from the Main Operating Account, such funds are provided by the Debtors from the Revenue Account to the Operating Disbursement Account, the Payroll Account, or to make other payments that would otherwise normally be paid from the Main Operating Account.

55.     It is my understanding that most other cash deposits generated by the Debtors' businesses, including (i) reimbursements of Operating Expenditures from Non-Operators and (ii) amounts received from the Debtors' oil and gas swap counterparties, are

deposited into the Main Operating Account.  Operating Expenditure reimbursements received by

the Debtors from Non-Operators by check are deposited into the Comerica Lock Box.

56.    I understand that funds from the Main Operating Account are distributed

as necessary in the following manner:

(a) *Payroll Account*:    Certain funds are deposited in the Payroll
Account.  The Payroll Account is used to pay Automatic Data Processing, Inc. ("**ADP**") for
the purpose of distributing money to the Debtors' employees.

(b) *Operating Disbursement Account:* Main Operating Account funds
are swept on a daily basis into the Operating Disbursement Account.  The Operating
Disbursement Account is used to pay Operating Expenditures in which the Debtors serve as
Operator, to pay a variety of expenses of the Debtors including, without limitation, capital
expenditures, payments on account of employee benefits, insurance and bonding payments,
debt service payments, and payments on account of authorized costs and expenses charged
JPMorgan credit cards issued to the Debtors' employees, and to make lease payments to
Chaparral Real Estate, which owns the Debtors' corporate and field offices and surface
acreage.

57.    In some instances in which the Debtors serve as Operator, the Debtors

require Non-Operators to prepay the Debtors for certain capital expenditures or other expenses.

Such prepayments are normally deposited into an escrow account.  It is my understanding that

currently, the Debtors have five escrow accounts at JP Morgan Chase Bank, N.A. (the "**Escrow**

**Accounts**"), which are used to make payments on account of such capital expenditures and other

expenses.

58.    It is my understanding that Chaparral Real Estate receives payments on

account of its leases of property to Chaparral Energy which are deposited into the Real Estate

Account, which Chaparral Real Estate then uses to make mortgage payments for certain real

property subject to mortgages, as discussed above.  Chaparral Real Estate also maintains a Real

Estate Sweep Account, which is swept as needed to replenish the Real Estate Account so that it

maintains a minimum balance of $30,000 at all times.

59.     CEI Pipeline earns revenues on account of gas gathering fees charged to third-parties with respect to pipes owned by CEI Pipeline.   My understanding is that these revenues are deposited into CEI Pipeline Main Operating Account.   From time to time, the Debtors transfer excess funds from the CEI Pipeline Main Operating Account to the Main Operating Account and account for such intercompany transfers in their books and records.

ii.     Continued Use of the Debtors' Existing Cash Management System and the Debtor Bank Accounts

60.     I believe the Cash Management System is an ordinary course, customary and essential business practice, the continued use of which is essential to the Debtors' business operations during these Chapter 11 Cases and their goal of maximizing value for the benefit of all parties in interest.   To require the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption.   I believe that any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value.   Moreover, such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements and, to the best of my knowledge, the majority of the Debtor Bank Accounts are held at financially stable institutions insured by the Federal Deposit Insurance Corporation ("**FDIC**").   Therefore, I believe that maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates, and all interested parties.   Accordingly, the Debtors request that they be allowed to maintain and continue to use the Cash Management System, including maintenance of their existing Debtor Bank Accounts.

61.     If the relief requested in the Cash Management Motion is granted, I have been informed that the Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by the Debtors prior to the Petition Date, other than those authorized by this Court.  To prevent the possible inadvertent payment of prepetition claims against the Debtors, except those otherwise authorized by the Court, I have been informed that the Debtors will work closely with the banks at which the Debtor Bank Accounts are maintained (each a "**Bank**" and, collectively, the "**Banks**") to ensure appropriate procedures are in place to prevent checks issued by the Debtors prepetition from being honored absent this Court's approval and to ensure that no third-party with automatic debit capabilities is able to debit amounts attributable to the Debtors' prepetition obligations.

62.     The Debtors request that no Bank that implements such handling procedures and then honors a prepetition check or other item drawn on any account that is the subject of the Cash Management Motion (a) at the direction of the Debtors to honor such prepetition check or item, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of a good faith error made despite implementation of reasonable item handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored postpetition. I believe that such flexibility accorded the Banks is necessary to induce the Banks to continue providing cash management services to the Debtors.

63.     In the Cash Management Motion, the Debtors further request that the Banks be authorized to deduct from the appropriate Debtor Bank Accounts the Banks' fees and expenses (the "**Bank Fees and Expenses**"), and that no liens on any Debtor Bank Accounts

take priority over the Bank Fees and Expenses except as set forth in any deposit agreements between the Debtors and the Banks.

64.    Additionally, in each instance in which the Debtors hold one or more accounts at a bank that is a party to a Uniform Depository Agreement with the U.S. Trustee, within fifteen (15) days of the date of entry of an Interim or Final Order granting the Cash Management Motion, I have been told that the Debtors will (i) contact such bank, (ii) provide such bank with the Debtors' employer identification numbers, and (iii) identify each of their accounts held at such bank as held by a debtor in possession in a bankruptcy case.  Where the Debtors hold one or more accounts at a bank that is not a party to a Uniform Depository Agreement with the U.S. Trustee, the Debtors will use their good faith efforts to cause such bank to execute a Uniform Depository Agreement in a form prescribed by the Office of the U.S. Trustee within forty-five (45) days of the date of entry of an interim or final Order granting the Cash Management Motion.

65.    In the interest of maintaining the continued and efficient operation of the Cash Management System during the pendency of the Chapter 11 Cases, in the Cash Management Motion, the Debtors request that all Banks be authorized and directed to continue to administer, service, and maintain the Debtor Bank Accounts as such accounts were administered, serviced, and maintained prepetition, without interruption and in the ordinary course (including making deductions for Bank Fees and Expenses), and, when requested by the Debtors in their sole discretion, to honor any and all checks, drafts, wires, ACH transfers, electronic fund transfers, or other items presented, issued, or drawn on the Debtor Bank Accounts on account of a claim against the Debtors arising on or after the Petition Date.

66.     The Debtors further request in the Cash Management Motion that they be authorized to implement such reasonable changes to the Cash Management System as the Debtors may deem necessary or appropriate, including, without limitation, closing any of the Debtor Bank Accounts and opening any additional bank accounts following the Petition Date (the "**New Accounts**") wherever the Debtors deem that such accounts are needed or appropriate and whether or not the banks in which the accounts are opened are designated approved depositories in the District of Delaware.  I understand that, notwithstanding the foregoing, any New Accounts that the Debtors open will be at banks that have executed a Uniform Depository Agreement with the U.S. Trustee, or at such banks that are willing to immediately execute such an agreement, and any New Account that the Debtors open will be (i) at one of the existing Banks or with a bank that is organized under the laws of the United States of America or any state therein and that is insured by the FDIC or the Federal Savings and Loan Insurance Corporation and (ii) designated a "Debtor in Possession" account by the relevant bank.  The Debtors request that the relief sought by the Cash Management Motion extend to any New Accounts and that any order approving the Cash Management Motion provide that the New Accounts are deemed to be Debtor Bank Accounts that are similarly subject to the rights, obligations, and relief granted in such order.  I understand the Debtors will provide the U.S. Trustee with prompt notice of any Debtor Bank Accounts that they close or New Accounts that they open.  In furtherance of the foregoing, the Debtors also request that the relevant banks be authorized to honor the Debtors' requests to open or close (as the case may be) such Debtor Bank Account(s) or New Account(s).

iii.     Continued Use of the Debtors' Existing Checks and Business Forms

67.     To minimize expenses to their estates, the Debtors seek authorization in the Cash Management Motion to continue using all checks substantially in the forms existing

immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession; provided, however, that in the event the Debtors generate new checks during the pendency of the Chapter 11 Cases other than from their existing stock of checks, such checks will include a legend referring to the Debtors as "Debtor in Possession".  The Debtors also seek authority to use all correspondence and other business forms (including, without limitation, letterhead, purchase orders, and invoices) without reference to the Debtors' status as debtors in possession.

68.     I believe that changing the Debtors' existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtors' estates. Further, I believe that such changes would disrupt the Debtors' business operations and would not confer any benefit upon parties that deal with the Debtors.  For these reasons, the Debtors request that they be authorized to use their existing check stock, correspondence, and other business forms without being required to place the label "Debtor in Possession" on any of the foregoing.

iv.     Waiver of Certain Requirements of the U.S. Trustee

69.     The Debtors further request in the Cash Management Motion, that this Court grant a waiver of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with (i) the Debtors' existing practices under the Cash Management System or (ii) any action taken by the Debtors in accordance with any order granting the Cash Management Motion or any other order entered in the Chapter 11 Cases.  I understand that in order to supervise the administration of chapter 11 cases, the U.S. Trustee has established certain operating guidelines for debtors in possession.  I have been informed that these requirements (the "**UST Requirements**") require chapter 11 debtors to, among other things: (i) close all existing bank accounts and open new debtor in possession bank accounts;

(ii) establish one debtor in possession account for all estate monies required for the payment of taxes, including payroll taxes; (iii) maintain a separate debtor in possession account for cash collateral; and (iv) obtain checks for all debtor in possession accounts that bear (a) the designation "Debtor In Possession," (b) the bankruptcy case number, and (c) the type of account.  It is my understanding that the UST Requirements are designed to demarcate clearly prepetition transactions and operations from postpetition transactions and operations, and to prevent the inadvertent postpetition payment of prepetition claims.  As set forth above, I submit that (i) the Debtors are able to work with the Banks to ensure that this goal of separation between the prepetition and postpetition periods is observed and (ii) enforcement of certain of these UST Requirements would disrupt the Debtors' operations and impose a financial burden on the Debtors' estates.

70.    In light of the complexity of the Cash Management System, I believe that it would be onerous for the Debtors to meet the UST Requirement to close all existing bank accounts and open new debtor in possession accounts.  Indeed, I believe this requirement would unnecessarily inconvenience the Debtors.

71.    Further, I believe that it would be unnecessary and inefficient to require the Debtors to abide by the UST Requirement to establish specific debtor in possession accounts for tax payments (including payroll taxes) and to deposit to such accounts sufficient funds to pay any tax liability (when incurred) associated with the Debtors' payroll and other tax obligations.  I believe that the Debtors can pay their tax obligations most efficiently from their existing accounts at JPMorgan in accordance with their existing practices, and the U.S. Trustee will have wide latitude to monitor the flow of funds into and out of such accounts.  I believe that

the creation of new debtor in possession accounts designated solely for tax obligations would be unnecessarily burdensome.

72.    In addition, I believe it is unnecessary to require the Debtors to abide by the UST Requirement to establish specific debtor in possession accounts for cash collateral. As set forth in the Debtors' Cash Collateral Motion, the Debtors have provided significant safeguards (negotiated in good faith with parties in interest) to ensure that parties with security interests in the Debtors' cash are adequately protected and that such parties have been provided with notice of the proposed use of such cash collateral.

    v.    Continued Deposit Practices

73.    As part of the Cash Management System, the Debtors routinely deposit funds into the Debtor Bank Accounts (the "**Deposit Practices**"). In the Cash Management Motion, the Debtors request (i) authorization to continue to deposit funds in accordance with existing practices under the Cash Management System, subject to any reasonable changes the Debtors may implement to the Cash Management System, and (ii) a waiver of the deposit requirements of Bankruptcy Code Section 345(b), on an interim basis, to the extent that such requirements are inconsistent with the Deposit Practices. For the avoidance of doubt, to the extent any of the Debtor Bank Accounts may be classified as investment accounts, or to the extent any of the Debtors' routine deposits into Debtor Bank Accounts may be regarded as investment activity, the Debtors seek authorization to continue to deposit funds into such Debtor Bank Accounts in accordance with existing practices, notwithstanding the requirements of Bankruptcy Code Section 345(b).

vi. <u>Continued Ordinary Course Intercompany Transactions and Postpetition Intercompany Claims and Accordance of Superpriority Status</u>

74.    Additionally, in connection with the daily operation of the Debtors' businesses, funds are moved within the Cash Management System.  I understand that there may be intercompany claims owing among the Debtors at any given time.  Specifically, certain of the Debtors sometimes directly use funds held in the name of Chaparral Energy or participate in transactions with other Debtors, including payment of their expenses and operating costs (the "**Intercompany Transactions**").  As a result of the Intercompany Transactions, I understand that the Debtors' books and records reflect prepetition obligations among the Debtors.  Before the commencement of these Chapter 11 Cases, I understand that the Debtors engaged in Intercompany Transactions in the ordinary course of business including, but not limited to, the following:

(c) *Payment of Expenses*:  Expenses paid by a Debtor on behalf of other Debtors (for example, payment of invoices for essential goods, tax and audit services, insurance), which are allocated among the beneficiaries of such payments.  Such transfers are recorded on intercompany accounts.

(d) *Lease Payments*:  Lease payments made by Chaparral Energy to Chaparral Real Estate, which owns the Debtors' corporate and field offices and surface acreage.  Such payments are deposited into the Real Estate Account from the Disbursement Account.

(e) *Transfer of Excess Funds to Main Operating Account*:  Ordinary course transactions, involving the Debtors transferring cash to pay general operation and administrative expenses and other expenses.  Such transfers are recorded on intercompany accounts.

75.    By the Cash Management Motion, the Debtors seek authority to pay for or otherwise reconcile prepetition Intercompany Transactions if the Debtors, in their sole discretion, deem such payment or reconciliation necessary and in the best interests of the Debtors' estates and other parties in interest.  Additionally, the Debtors seek authority to set off prepetition obligations arising out of the Intercompany Transactions.  Finally, the Debtors seek

authority, in their sole discretion, to continue to engage in Intercompany Transactions postpetition in the ordinary course of business.  It is my understanding that all Intercompany Transactions and payments will only be effectuated in accordance with all applicable strictures established in the Debtors' cash collateral order and documentation.

76.    The Debtors maintain records of all fund transfers and can ascertain, trace, and account for Intercompany Transactions.    At the same time, if the Intercompany Transactions were to be discontinued, I believe that the Cash Management System and the related administrative controls would be disrupted to the Debtors' detriment.

77.    To ensure that each individual Debtor will not fund the operations of another entity at the expense of such Debtor's creditors, the Debtors request that all postpetition claims against a Debtor by another Debtor arising from Intercompany Transactions (the "**Intercompany Claims**") be accorded superpriority administrative claim status, subject and subordinate only to other superpriority administrative claims granted pursuant to an order of the Bankruptcy Court regarding the use of cash collateral.  I believe that if postpetition Intercompany Claims are accorded superpriority administrative claim status, then each individual Debtor on whose behalf another Debtor has utilized funds or incurred expenses will continue to bear ultimate repayment responsibility, thereby protecting the interests of each individual Debtor's creditors.  Accordingly, I believe that the Court should grant superpriority status to postpetition Intercompany Claims.

### B.    Workforce Obligations Motion

78.    In the Workforce Obligations Motion, the Debtors request entry of the interim and final orders, authorizing them, in their discretion, to pay, continue, or otherwise honor various prepetition workforce-related obligations (collectively, the "**Prepetition**

**Workforce Obligations**") to or for the benefit of their (a) employees (collectively, the "**Employees**") and (b) independent contractors (the "**Independent Contractors**" and, together with the Employees, the "**Workforce**") for compensation, benefits, and expense reimbursements under all plans, programs, and policies maintained or contributed to, and agreements entered into, by the Debtors prior to the Petition Date (as described below, the "**Workforce Programs**").  In addition, the Debtors request that the Court confirm their right to continue each of the Workforce Programs in the ordinary course of business during the pendency of these Chapter 11 Cases in the manner and to the extent that such Workforce Programs were in effect immediately prior to the filing of such cases and to make payments in connection with expenses incurred in the postpetition administration of any Workforce Program.

79.    The Workforce Programs under which the Prepetition Workforce Obligations arise are described more fully in the Workforce Obligation Motion and include, without limitation, plans, programs, policies, and agreements providing for: (a) wages, salaries, holiday pay, paid time off, and other accrued compensation; (b) reimbursement of business, travel, and other reimbursable expenses; and (c) benefits, with coverage as applicable for eligible spouses and dependents, in the form of medical and dental coverage, basic term life insurance, accidental death and dismemberment insurance, short-term disability coverage, long-term disability coverage, workers' compensation, and miscellaneous other benefits provided to the Workforce in the ordinary course of business; (d) prepetition contributions to, and benefits under 401(k) plan; and (e) certain severance related obligations, as described in the Workforce Obligations Motion.

80.    The Debtors also request authorization to pay any and all local, state, and federal withholding and payroll-related or similar taxes relating to the Prepetition Workforce Obligations including, but not limited to, all withholding taxes, social security taxes, Medicare taxes, and Employment Insurance premiums.  In addition, the Debtors request authorization to pay to third parties any and all amounts deducted from Employee paychecks for payments on behalf of Employees for savings programs, benefit plans, insurance programs, and other similar programs.

81.    The Debtors also request that, with respect to any Workforce Programs that are administered, insured, or paid through a third-party administrator or provider, the Debtors be expressly authorized, in their discretion, to pay any prepetition claims of such administrator and provider in the ordinary course of business to insure the uninterrupted delivery of payments or other benefits to the Employees.

82.    In support of the Workforce Obligations Motion, the Debtors request that the Court authorize and direct all banks and financial institutions to receive, process, honor, pay, and, if necessary, reissue all prepetition and postpetition checks and fund transfers, including prepetition checks and electronic payment and transfer requests that the Debtors reissue or re-request postpetition, drawn on the bank accounts used by the Debtors to satisfy their obligations in connection with Prepetition Workforce Obligations, upon receipt by each bank or financial institution of notice of such authorization, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.  The Debtors additionally request that the Court authorize them to issue new postpetition checks to replace any checks that may nevertheless be

dishonored and to reimburse any expenses that holders of claims in connection with Prepetition Workforce Obligations may incur as a result of any bank's failure to honor a prepetition check.[7]

83.    As discussed above, as of the Petition Date, the Debtors' Workforce consisted of approximately 354 Employees.  Of the Employees, approximately 181 are salaried Employees and approximately 189 are hourly Employees.  The Debtors' Workforce also currently includes approximately 35 Independent Contractors.  CELLC employs the Debtors' entire Workforce.

84.    I believe that the Debtors' ability to preserve their businesses and successfully reorganize is dependent on the expertise and continued enthusiasm and service of their Workforce.  Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, I believe that the morale and, thus, the performance of the Debtors' Workforce may be adversely affected.

85.    It is my belief that if the Debtors fail to pay the Prepetition Workforce Obligations in the ordinary course, their Workforce will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.  Such a result would have a highly negative impact on Workforce morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtors and their estates.  I believe that continuation of the Workforce Programs is vital to preserving and rebuilding Workforce morale during the pendency of these Chapter 11 Cases and to reducing the level of attrition that might otherwise occur.

---

[7]    It is my understanding that similar requests are made in each of the First Day Pleadings.

i.    Prepetition Workforce Compensation

86.    Employee Payroll and Payroll Deductions.  The Employees are paid bi-weekly on Fridays (or on the preceding business day if these dates fall on a holiday).  The next payroll date is May 13, 2016.  I understand that the average payroll each pay period is approximately $2,000,000 in the aggregate.  The Debtors utilize ADP for the administration of payroll for the Employees.  Employees assigned to the Headquarters are paid current, in that they receive their bi-weekly earnings on the last day of the current pay period.  Employees that work in the field are paid two weeks in arrears, so that they receive their bi-weekly earnings two weeks after the last day of a pay period.

87.    It is my understanding that in the ordinary course of their businesses, the Debtors make deductions from Employees' paychecks for payments to third parties on behalf of Employees for various federal, state, and local income, FICA, and other taxes, court ordered garnishments, as well as for savings programs, repayments for loans taken against the savings programs, pension plans, benefit plans, insurance and other similar programs (collectively, the "**Deductions**").  I have been informed that over the past twelve (12) months, the Debtors' average bi-weekly Deductions for Employees aggregated approximately $800,000.

88.    I believe that employees may be owed certain prepetition amounts on account of regular compensation earned through the Petition Date.  As such, the applicable Deductions have not yet been taken.  Additionally, even where Deductions have been withheld from the applicable Employee's paycheck, the Debtors may not yet have forwarded the Deductions to the various third parties to which the Deductions are required to be distributed.

89.    I understand that the Debtors pay their Employees who work in the field in arrears for work performed two or more weeks prior to the Debtors' normal bi-weekly payroll.  As a result, such Employees often have a significant amount of unpaid wages and other

35

compensation that has accrued, but is unpaid.  As a result, I have been informed that, as of the

Petition Date, accrued but unpaid wages and other compensation, including the Deductions,

total approximately $700,000 (comprised of $614,000 owed to the Employees and $86,000

attributable to the Deductions), which is almost entirely attributable to amounts owed on

account of amounts owed to field Employees.

        90.    <u>Independent Contractors</u>.  In addition to the Employees, the Debtors also

retain approximately 35 Independent Contractors, including contract pumpers, IT support

specialists, geologists, and geophysicists, to perform a variety of tasks related to the Debtors'

operations in the ordinary course of business.  I understand that the Independent Contractors

may provide services to the Debtors directly, or the Debtors may utilize the services of certain

employment agencies in connection with engaging certain Independent Contractors.   The

Debtors do not pay wages, withhold taxes or provide benefits or paid time off for the

Independent Contractors.  Instead, the Debtors make payments to Independent Contractors or

their contracting agency based upon the relevant agreement.  The Independent Contractors are

generally paid on an hourly basis and they provide the Debtors with invoices for their services

(and generally are paid) monthly.  I understand that on average, the Debtors pay approximately

$200,000 per month in the aggregate to the Independent Contractors.

        91.    <u>Vacation Days, Holidays, and Sick Leave</u>.   As part of their overall

compensation, all Employees who work at least 30 hours per week ("**Regular Employees**") are

entitled to paid time off ("**<u>PTO</u>**") plus 10 additional paid holidays per year.  Regular Employees

earn 120 to 240 hours of PTO per year, accruing proportionally each pay period, depending

upon their experience or length of time in the industry, with those Employees who are more

experienced or have been in the industry longer being entitled to a greater number of PTO hours than those Employees with less experience.

92.     I understand that typically, Employees may carry over up to 320 unused PTO hours from one calendar year to the next.  Upon termination or retirement, Employees receive payment on account of any accrued and unused PTO hours, up to the maximum carryover hours.  This policy is consistent with what I understand are the laws of most states, which provide that vacation benefits are vested and must be paid upon termination of employment.  It is my understanding that, as of the Petition Date, total accrued but unpaid PTO liability is approximately $3,800,000.  Although the Debtors request authority to pay such accrued but unpaid vacation liability in the ordinary course of business as necessary, it is my understanding that no amounts will be due or owing to any Employee unless and until such Employee is no longer employed by the Debtors.

93.     AIM Program; Incentive Plan.  In the ordinary course of business, in order to encourage and reward outstanding performance, the Debtors offer full-time Employees the opportunity to earn bonuses under an annual incentive measures program (the "**AIM Program**"), under which the Employees are eligible to earn awards based on individual and business targets.  The target amount that an individual may receive under the AIM Program is a percentage of their annual base salary.  Half of the amount that an Employee may receive is based on company performance on nine identified metrics from the previous year.  The other half is discretionary and based on various factors, including, but not limited to, departmental and individual performance.  The Board has discretion with regard to funding the AIM Program at any amount up to funding the full target amount for all Employees.  If the Board determines that it is appropriate to fund the AIM Program, then bonuses are paid in the regular payroll on

or immediately prior to March 15th to eligible Employees that are still employed by the Debtors as of such date. In 2015, I understand that the Debtors met or exceeded the company's annual performance thresholds in seven of nine categories; accordingly, on March 11, 2016, the Debtors awarded bonuses to its 366 Employees whose individual performance reviews indicated the Employee met or exceeded his or her performance expectations in 2015. I believe that such bonuses were necessary to maintain Employee morale and minimize attrition and consistent with bonuses granted by the Debtors in previous years and bonuses granted by other oil and gas companies. With limited exceptions, bonuses for 2015 performance have already been paid. It is my understanding that the Debtors do not anticipate that any further awards will be made under the AIM Program in 2016 or during these Chapter 11 Cases.

94.    The Debtors also maintain a Long Term Cash Incentive Plan (the "**Incentive Plan**"). Under the Incentive Plan, certain non-insider Employees selected by the executive committee of CELLC (the "**Executive Committee**") are entitled to a cash payment in an amount determined by the Executive Committee. Amounts awarded under the Incentive Plan vest over a period of four years, with 25% of the total amount vesting at the end of each plan year, August 31st. Amounts that have vested under the Incentive Plan are paid to Employees annually within 30 days of August 31st. In most cases, the Employee must remain employed by the Debtors at the end of a plan year for any Incentive Plan awards to vest for such year. I understand that as of the Petition Date, 110 Employees have been selected by the Executive Committee to participate in the Incentive Plan. Given the large percentage of the Employees covered by the Incentive Program, I believe that any interruption in payments pursuant to the Incentive Plan could upset Employee morale or cause attrition, which could lead to severe disruptions to the Debtors' operations. The Debtors estimate that, as of the Petition

Date, accrued but unpaid awards under the Incentive Plan, total approximately $2,700,000, which will vest and are to be paid in equal parts in each of 2016 through 2019.

        ii.      <u>Prepetition Employee Reimbursements</u>

      95.    <u>Business Expenses</u>.  The Debtors, in the ordinary course of their business, reimburse Employees for a variety of ordinary, necessary, and reasonable business-related expenses that Employees incur within the scope of their job duties.  These include expenses for business travel (including lodging, automobile rentals, meals, and internet charges), business-related taxi and mileage costs, and other general business-related expenses.  Employees are expected to use sound judgment and good business sense when incurring the expenses.  In order to be reimbursed, an Employee must submit his or her receipts to the Employee's manager for approval.  If approved, the Debtors reimburse the Employee by check when manual checks are cut in the ordinary course of the Debtors' businesses.  The Debtors also reimburse (or pay directly) for certain professional expenses, such as required continuing education expenses, professional license fees or dues, and subscriptions.  I have been informed that there are accrued but unpaid amounts owing to Employees for reimbursements on account of business expenses totaling approximately $76,000 as of the Petition Date.

      96.    Certain Employees chosen by the Debtors are issued a company credit card (a "**Credit Card**") through JPMorgan Chase Bank, N.A. ("**JPM**") or Diner's Club International ("**Diner's Club**") to be utilized for business-related expenses.  The Debtors make all Credit Card payments and are reimbursed by Employees for any unapproved expenses.  Receipts for expenses charged to a Credit Card must be submitted by the Employee to a reviewer designated by the Debtors for approval.  Employees who fail to turn in receipts or turn in receipts for unapproved purposes will have the total amount of such receipts deducted from

their next paycheck.  The average monthly amount of reimbursable expenses paid by the Debtors is approximately $300,000, inclusive of amounts that are owed on the Credit Cards.

97.    <u>Miscellaneous</u>.    The Debtors also offer certain other miscellaneous programs and benefits.  For example, the Debtors offer Employees the ability to participate in a qualified educational assistance program to obtain professional education and certifications (the "**<u>Education Program</u>**") and in wellness reimbursement programs (the "**<u>Wellness Program</u>**"). Under the Education Program, the Debtors provide reimbursement to Employees for reasonable educational expenses, including, but not limited to, tuition, books and certain required fees incurred in conjunction with job related courses at an accredited educational institution that are pre-approved by the Employee's manager.  In order to be reimbursed for the Education Program, an Employee must successfully complete the approved course with a passing grade and submit the Employee's receipts to the Employee's manager for approval.  Under the Wellness Program, the Debtors provide reimbursement to Employees on account of their health club memberships, tobacco cessation programs, and weight management programs.  In order to be reimbursed for the Wellness Program, an Employee must submit receipts and evidence that the Employee has participated in the qualifying program to the Employee's manager for approval.  If such expenses are approved, the Debtors reimburse the Employee by check when manual checks are cut in the ordinary course of the Debtors' businesses.  I have been informed that the total amount of reimbursements paid under the Education and Wellness Programs in 2015 was $86,000 and $7,400, respectively.  I understand that because the Education Program and Wellness Program provide for quarterly reimbursements, the Debtors believe there are accrued but unpaid amounts under the Education Program or the Wellness Program of approximately $24,000 as of the Petition Date.

98.     I have been informed that the total prepetition obligations in respect of Workforce reimbursements (the "**Reimbursement Obligations**") will not exceed $400,000 as of the Petition Date.

iii.     Employee Benefits; Severance Payments

99.     Prior to the Petition Date, the Debtors offered Employees and their eligible spouses and dependents various standard employee benefits, including, without limitation, (a) medical insurance (b) dental insurance, (c) basic term life and accidental death and dismemberment insurance, (d) long-term and short-term disability insurance, (e) savings and related types of benefits, (f) workers' compensation, (g) severance benefits, and (h) miscellaneous other benefits provided to the Employees in the ordinary course of business (collectively, the "**Employee Benefits**").  As of the Petition Date, I understand that the Debtors were obligated to pay certain contributions to or provide benefits under such plans, programs, and policies.

100.  Medical Insurance.   The Debtors offer all Regular Employees the opportunity to obtain basic medical insurance, vision care, prescription drug coverage, and related benefits under one of two plans administered by Blue Cross Blue Shield ("**BCBS**").  I understand that Regular Employees have the ability to choose between two plans, a high-deductible health plan combined with a health savings account (the "**HDHP**") and a PPO plan (the "**PPO Plan**" and, together with the HDHP, the "**BCBS Plans**"), each of which provides for similar types of medical and prescription drug coverage.  Both options are preferred provider organization plans, under which eligible Employees and their family members have the choice to use providers within the network or to use providers outside the network (the latter option being subject to higher costs to the Employee).  The PPO Plan has a higher upfront premium cost than the HDHP, but lower deductible and copayment costs for the Employee.  I understand

41

that Participating Employees pay semi-monthly premiums through payroll deductions remitted to BCBS of between approximately $0 and $160 depending on (i) the plan selected, (ii) tobacco use, (iii) family coverage, and (iv) whether the Employee participates in a program to promote Employee health and wellbeing (the "**Health and Wellbeing Program**") administered by Viverae, Inc. ("**Viverae**").

101.   Under the Debtors' Health and Wellbeing Program, I understand that Employees participating in the BCBS Plans may be eligible to receive a discount to their BCBS Plan premiums if they complete an online health assessment questionnaire, submit to a biometric screening, and take certain other preventive care actions.   Viverae provides the Debtors with data collection services to facilitate the Health and Wellbeing Program.

102.   The Debtors also provide Employees participating in the BCBS Plans with access to telephonic and online medical services ("**Telehealth Services**") through MDLive Inc. ("**MDLive**").   I understand that Telehealth Services allow participating Employees to speak to a physician by phone, website, or mobile app 365 days a year for non-emergency medical issues who can recommend treatments and write prescriptions for a variety of non-emergency ailments.

103.   The Debtors are self-insured for medical benefits, including prescription drug coverage.   Accordingly, it is my understanding that after BCBS provides a discount to invoices received from providers on account of Employee medical expenses under the BCBS Plans and determines the eligibility of expenses and under the BCBS Plans and the Participating Employees pay any required deductibles or co-pays, the Debtors are responsible to pay all eligible remaining medical expenses of Employees participating in the BCBS Plans.   The

Debtors remit approved amounts to BCBS, which distributes the payments to medical service providers.

104.   I understand that the obligations that the Debtors incur on behalf of the Employees on account of the BCBS Plans fluctuate based on the medical needs of the Employees, but average approximately $500,000 per month.  The Debtors pay such expenses for medical claims submitted in the previous month and an administration fee of approximately $52,000 directly to BCBS each month.  Additionally, the Debtors pay a monthly administration fee of approximately $330 to MDLive for providing Telehealth Services and $3,200 to Viverae for data collection services in connection with the Health and Wellbeing Program.  I have been informed that, as of the Petition Date, the Debtors owe approximately $750,000 on account of the BCBS Plan, including $330 on account of fees owed to MDLive, and $3,200 on account of fees owed to Viverae.

105.   <u>Dental Insurance</u>.  The Debtors provide all Regular Employees with the option to enroll in a dental insurance plan administered by Delta Dental ("**Delta**" and the plans, the "**Delta Plans**").  I understand that eligible Employees may enroll in their choice of two coverage options, either a 'base' plan with a low premium and low maximum benefit, or a 'high' plan with higher premiums and higher maximum benefit.  200 Employees (and their dependents) receive up to $2,000 in dental coverage per year through the high deductible plan, which covers 100% of all eligible expenses for most preventive care, 20% or more of expenses relating to other dental care, and includes orthodontic benefits.  On the base plan, 148 Employees (and their dependents) receive up to $1,000 in dental coverage per year, which covers 100% of all eligible expenses for most preventive care and 20% or more of expenses relating to other dental care, but does not include orthodontic benefits.  It is my understanding

that participating Employees pay a portion of semi-monthly premiums through payroll deductions remitted to Delta of up to $45 depending on the plan selected and family coverage.

106.    The Debtors pay the remainder of the premiums charged by Delta, which include Delta's administration fees, to Delta on a monthly basis.  I understand that the Debtors pay between $30,000 to $35,000 on account of such supplemental premiums and administration fees.  As of the Petition Date, I have been informed that the Debtors owe approximately $35,000 on account of premiums and administration fees to Delta on account of the Delta Plans.

107.    <u>Pre-Tax Contribution Health Savings Accounts and Flexible Spending Accounts</u>.  The Debtors offer all of their Employees participating in the HDHP the opportunity to contribute, through pre-tax compensation deductions, to health saving accounts ("**HSAs**") to be used for healthcare related expenses.  I understand that on behalf of Employees participating in the HDHP, the Debtors contribute $1,000 for Employee-only coverage and $2,000 for family coverage annually into each participating Employees' HSA.  Participating Employees may then contribute a portion of his or her eligible earnings each year on a pre-tax basis to his or her HSA, subject to limits imposed by federal law.  The Debtors deduct Employee contributions from the Debtors' bi-weekly payroll and deposits such contributions into HSAs created by, and held in the name of, each participating Employee.  A participating Employee may only use his or her HSA for eligible medical expenses.  I have been advised that as of the Petition Date, the Debtors are holding HSA deductions to be remitted to various HSAs of approximately $15,000.

108.    The Debtors additionally offer all of their Employees the opportunity to contribute, through pre-tax compensation deductions, to flexible spending accounts ("**FSAs**") to be used for healthcare related expenses and dependent care expenses, subject to limits imposed by federal law.  FSA deductions are made from Employees' paychecks.  In order to be

reimbursed for these expenses, Employees must submit eligible claims to HSABank, which administers the claims under the FSAs and remits reimbursements to the Employees. HSABank makes these payments from FSAs maintained by the Debtors. I understand that as of the Petition Date, the Debtors are holding FSA deductions to be remitted to HSABank of approximately $15,000.

109. <u>Life and Accidental Death and Dismemberment Insurance, Short-Term Disability Program, and Long-Term Disability Program</u>. Employees receive, at the Debtors' cost, short-term disability ("**STD**") insurance, long-term disability ("**LTD**") insurance, accidental death and dismemberment ("**AD&D**") insurance, and life insurance under plans (the "**Health Benefits Programs**") administered by Cigna Health and Life Insurance Company ("**Cigna**").

110. It is my understanding that under the Debtors' STD insurance program (the "**STD Plan**"), if an Employee becomes disabled for at least seven (7) days, Cigna pays benefits equal to seventy (70%) of the Employee's monthly base salary, up to a maximum of $3,000 per week for a period of up to twelve (12) weeks.

111. I have been informed that under the Debtors' LTD insurance program (the "**LTD Plan**"), if an Employee becomes disabled for at least ninety (90) days, Cigna pays benefits equal to sixty (60%) of the Employee's monthly base salary, up to a maximum of $8,000 per month for a period of up to forty-two (42) months. The LTD Plan also provides the family of the Employee with benefits in the event of the Employee's death.

112. The Debtors also provide Regular Employees with group term life insurance and AD&D insurance in amounts equal to two (2) times the Employee's annual salary, up to a maximum of $750,000, at no charge to Employees until retirement. Regular

Employees may also purchase additional voluntary term life and AD&D insurance for themselves and their dependents at their own cost up to a maximum of $500,000 for themselves, $100,000 for their spouses, and $10,000 for other dependents.

113.    The Debtors pay the premiums for the Health Benefits Programs to Life Insurance Company of North America on behalf of Cigna each month.  The premiums for any voluntary term life and AD&D insurance purchased by Employees are then deducted from the applicable Employee's paychecks and reimbursed to the Debtors.  I have been informed that as of the Petition Date, the Debtors owe approximately $140,000 to Cigna on account of premiums under the Health Benefits Programs.

114.    <u>Savings Plan</u>.  The Debtors sponsor a 401(k) retirement savings plan (the "**401(k) Plan**") for their Employees.  The 401(k) Plan is administered by the Fidelity Investments ("**Fidelity**").  Under the 401(k) Plan, an Employee may contribute a portion of his or her eligible earnings each year on a pre-tax basis to the 401(k) Plan, subject to limits imposed by federal law.  I understand that these contributions are deducted from the paychecks of participating Employees and held in trust on the Employees' behalf until such amounts are paid to Fidelity Management Trust Company (the "**Trustee**") to be held in an account maintained by the Trustee on the Employee's behalf.  In addition, the 401(k) Plan permits Employees to take loans against their individual 401(k) account, and the Debtors deduct loan payments from such Employee's paycheck and remit such amounts to the Trustee.  The Debtors' 401(k) committee oversees the 401(k) Plan and receives advice for investment decisions from Lockton Investment Advisors, LLC ("**Lockton**").  I have been informed that currently, 340 Employees participate in the 401(k) Plan.

115.    The Debtors match Employee contributions up to 7% of the participating Employee's salary, subject to limits imposed by federal law.  It is my understanding that one-third of the Debtors' contributions vest annually at the end of each year that the Employee has remained employed by the Debtors over a three-year period, after which all contributions of the Debtors vest in full when made.   The Debtors' matching contributions are paid directly to the Trustee for deposit into Employee accounts.  The Debtors paid approximately $700,000 in connection with matching contributions for the first quarter of 2016.  I understand that the Debtors expect that the total aggregate amount of contributions in the second quarter of 2016 will be similar to the amount paid for the first quarter of 2016.  I believe that the Debtors' matching 401(k) contribution is a critical component of the Employees' compensation.  Failure to make such payments would negatively impact morale and place undue hardship on Employees that could result in losses of Employees during these Chapter 11 Cases.  Accordingly, I believe it is important for the Debtors to have authority to make matching contributions under the 401(k) Plan in 2016.

116.    <u>Workers' Compensation</u>.  I understand that under the laws of the various states in which they operate, the Debtors are required to maintain workers' compensation policies and programs, or participate in workers' compensation programs administered by state governments, to provide their Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors.

117.    Employees are covered under a workers' compensation policy issued by Zurich American Insurance Company ("**<u>Zurich</u>**").  The Debtors pay Houston Series of Lockton Companies on behalf of Zurich approximately $406,000 per year for workers' compensation coverage, and there is no deductible per occurrence in connection with the Zurich policy.  I

understand that under the Zurich policy, upon the filing of a verified claim by an eligible Employee, Zurich pays the claim amount directly to the Employee.

118.   I believe that it is critical that the Debtors be permitted to continue their workers' compensation program and to pay outstanding prepetition claims, taxes, charges, assessments, premiums, and third party administrator fees in the ordinary course of business because alternative arrangements for workers' compensation coverage would most certainly be more costly, and the failure to provide coverage may subject the Debtors and/or their officers to severe penalties.  To facilitate the ordinary course handling of workers' compensation claims, in the Workforce Obligations Motion the Debtors further request authority, in their sole discretion, to lift the automatic stay to allow workers' compensation claimants to proceed with their claims under the applicable insurance policy or program and to allow the Debtors or their insurance providers and/or third party administrators to negotiate, settle and/or litigate workers' compensation claims, and pay resulting amounts, whether such claims arose before or after the Petition Date.

119.   Severance Program.  As part of the Debtors' cost-saving initiatives, the Debtors reduced their workforce by 213 Employees in 2015 and 62 Employees in 2016.  In connection with this recent reduction in force, the Debtors provided severance packages to Employees who were terminated in accordance with the Debtors' past practice.  In addition, from time to time the Debtors provide severance benefits to Employees not related to a reduction in force.  I understand that these benefits are typically provided in exchange for a release in liability for the Debtors.  Accordingly, I believe that it is important that Debtors have the flexibility to maintain their current practice of honoring their severance program for Employee retention and morale.  In the Workforce Obligations Motion, the Debtors seek to

continue providing such benefits in the ordinary course of business to Employees, other than insiders.  I have been advised that as of the Petition Date, the aggregate accrued and unpaid amount of such prepetition severance obligations is approximately $20,000.

120.  <u>Field Employee Per-Diem</u>.  The Debtors also provide Employees who work in the field with a per-diem based on the type of work that they perform.  Field Employees are entitled to a per-diem of $25 plus an additional $25 if they are required to remain in the field for four or more consecutive days.   The Debtors pay the per-diem to its field Employees in connection with the Debtors' bi-weekly payroll.  It is my understanding that, as of the Petition Date, the aggregate accrued and unpaid amount of per-diem obligations is $10,000.

121.  <u>Honoring of Prepetition Benefits</u>.   As described above, certain of the Employee Benefits remained unpaid or unprovided as of the Petition Date because certain obligations of the Debtors under the applicable plan, program, or policy accrued either in whole or in part prior to the commencement of these Chapter 11 Cases, but will not be required to be paid or provided in the ordinary course of the Debtors' business until a later date.  The Debtors request authority to pay or provide as they become due all prepetition Employee Benefits that have already accrued and that are described above.  I have been advised that the aggregate accrued amount of such prepetition Employee Benefits described in the Workforce Obligations Motion, including severance payments, is approximately $2,000,000.

iv.     <u>Continuation of Workforce Programs Postpetition</u>

122.  In the Workforce Obligations Motion, the Debtors also request confirmation of their right to continue to perform their obligations with respect to all Workforce Programs, except as otherwise indicated therein.  I believe the Workforce Programs are essential to the Debtors' efforts to maintain Workforce morale and minimize attrition.  I further believe that the expenses associated with the Workforce Programs are reasonable and cost-efficient in

light of the potential attrition, loss of morale, and loss of productivity that would occur if the Workforce Programs were discontinued.

123.    Notwithstanding the foregoing, I have been informed that the Debtors reserve the right to evaluate all Workforce Programs and to make such modifications, including terminating any particular plan, program, or policy, as may be necessary or appropriate during the pendency of these Chapter 11 Cases.

v.    <u>Payments to Independent Directors</u>

124.    In the ordinary course of business, the Debtors reimburse expenses on a quarterly basis to three non-Employee members of Chaparral's board of directors (the "**<u>Independent Directors</u>**").  I believe the Independent Directors' service is necessary for the continued management of the Debtors and, accordingly, it is essential that the Debtors be authorized to pay all prepetition amounts accrued as of the Petition Date to the Independent Directors.  I have been informed that, as of the Petition Date, the aggregate accrued but unpaid amounts owed to the Independent Directors is approximately $10,000.  In addition, out of an abundance of caution, in the Workforce Obligations Motion the Debtors request authority to continue to reimburse expenses to the Independent Directors on a postpetition basis in the ordinary course of business.

vi.    <u>Payments to Administrators</u>

125.    With respect to the Employee compensation and benefits described above, it is my understanding that the Debtors contract with several vendors to administer and deliver payments or other benefits to their Employees (the "**<u>Administrators</u>**").  The Debtors pay these Administrators' fees and expenses incurred in connection with providing such services.

126.    For example, I have been informed that the Debtors, in the ordinary course of business, pay monthly fees to Administrators as follows: (a) $5,600 (on average) to ADP in

connection with payroll administration, background screening and invoicing based on the number of Employees paid through ADP, (b) $52,000 to BCBS in connection with the administration of the BCBS Plan, (c) $1,000 to Life Insurance Company of North American on behalf of Cigna in connection with the administration of the STD Plan, LTD Plan, and AD&D insurance, (d) $3,200 to Viverae for data collection services in connection with the Health and Wellbeing Program, and (e) $330 to MDLive in connection with the administering of Telehealth Services, which total approximately $72,200 per month in the aggregate.

127.   In conjunction with the Debtors' payment of Prepetition Workforce Obligations and continued performance under Workforce Programs, I believe that it is necessary to obtain specific authorization to pay any claims of the Administrators on a postpetition basis, including prepetition claims to the extent necessary to ensure uninterrupted delivery of certain benefits to the Workforce.  I believe that the Administrators may fail to adequately and timely perform or may terminate their services to the Debtors unless the Debtors pay the Administrators' prepetition claims for administrative services rendered and expenses incurred.  I further believe that a need to engage replacement Administrators postpetition likely would cause significant disruption to the payment of benefits and other obligations to the Workforce.  Accordingly, I believe that the payment of claims owed to the Administrators is in the best interest of the Debtors' estates.

vii.     Payments to Employee Benefits Consultants

128.   The Debtors contract with PricewaterhouseCoopers ("**PwC**") for consulting services relating to the Employee Benefits.  It is my understanding that PwC assists the Debtors on an ongoing basis by, among other things, developing strategies to manage and optimize the Employee Benefits, providing information about trends in the employee benefits marketplace, and acting as a liaison between the Debtors and their insurers.  The Debtors pay

fees to PwC in connection with providing such services on a monthly basis in the amount of $25,000.

viii.    Honoring of Prepetition Checks

129.    I understand that prior to the Petition Date, the Debtors paid certain of their Prepetition Workforce Obligations with checks that had not been presented for payment as of the Petition Date.    In order to ensure the orderly payment of the Prepetition Workforce Obligations, the Debtors request that the Court enter an order requiring the Debtors' banks to honor any such checks which are drawn on the Debtors' accounts, and authorizing the banks to rely on the representations of the Debtors as to which checks are subject to the Workforce Obligations Motion.    To the extent that any such checks are nevertheless refused payment, I believe that it is important to Workforce morale that the Debtors receive the requested authority to issue replacement checks and to reimburse their Workforce for any loss resulting from the dishonoring.

**C.    Tax Motion**

130.    In the Tax Motion, the Debtors request entry of the Order authorizing them to pay, in their sole discretion, but subject to the terms and provisions of any cash collateral order, any prepetition tax and fee obligations including, without limitation, sales and use, income or gross receipts taxes, franchise taxes, net worth taxes, real and personal property taxes, business licensing, registration, commercial activity or other business, occupation or regulatory taxes or fees, fees relating to environmental and conservation laws and regulations, fees relating to participation in state regulatory agencies and boards, any other types of taxes, fees, assessments or similar charges and any penalty, interest or similar charges in respect of such taxes (collectively, the "**Taxes and Fees**") owing to certain federal, state and local governmental entities described in the Taxes Motion (the "**Taxing Authorities**").    The Debtors

propose to limit the aggregate amount of payments to be made on account of prepetition Taxes and Fees under the Tax Motion to $2,000,000 unless further authorization is obtained from this Court.

131. It is my understanding that the requested authorization would be discretionary, allowing the Debtors, among other things, to elect to pay Taxes and Fees as to which their officers and directors may have personal liability in the event of nonpayment by the Debtors before other Taxes and Fees; would be without prejudice to the Debtors' rights to contest the amounts of any Taxes and Fees on any grounds they deem appropriate; and would extend to the payment of Taxes and Fees relating to tax audits that have been completed, are in progress or arise from prepetition periods.

132. I understand that prior to the Petition Date, the Debtors incurred obligations to federal, state and local governments.  Although as of the Petition Date, I have been informed that the Debtors were substantially current in the payment of assessed and undisputed Taxes and Fees, certain Taxes and Fees attributable to the prepetition period may not yet have become due.  Certain prepetition Taxes and Fees may not be due until the applicable monthly, quarterly or annual payment dates—in some cases immediately and in others not until next year.  In 2015, the Debtors paid approximately $6,000,000 on account of Taxes and Fees.  I have been informed that as of the Petition Date, the Debtors have accrued liabilities, which are not yet due, in the approximate amount of $1,700,000 on account of Taxes and Fees.

133. I believe that the continued payment of the Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful Chapter 11 process.  If such obligations are not timely paid, I believe that the Debtors would be required to expend time and incur attorneys' fees and other costs to

resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws, including whether (a) the obligations are priority, secured or unsecured in nature, (b) the obligations are proratable or fully prepetition or postpetition and (c) penalties, interest, attorneys' fees and costs can continue to accrue on a postpetition basis and, if so, whether such penalties, interest, attorneys' fees and costs are priority, secured or unsecured in nature.

134.    Moreover, I understand that certain of the Taxes and Fees may be considered to be obligations as to which the Debtors' officers and directors may be held directly or personally liable pursuant to applicable federal, state or local laws in the event of nonpayment.  If any such taxes or fees remain unpaid, the Debtors' officers and directors may be subject to lawsuits or even criminal prosecution on account of such nonpayment during the pendency of these Chapter 11 Cases.  In such events, I believe collection efforts by the Taxing Authorities would provide obvious distractions to the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

135.    Although I have been informed that all federal, state and local governmental entities to which the Debtors or the Debtors' officers and directors may be liable are described in the Tax Motion, it is possible that other Taxes and Fees owed to additional federal, state or local governmental entities may be uncovered by the Debtors subsequent to the filing of the Tax Motion.  Accordingly, the Debtors request authority, in their sole discretion, to amend the Tax Motion to add or delete any federal, state or local governmental entity.

D.      **Insurance and Bonding Motion**

i.      <u>The Debtors' Insurance Obligations</u>

136.    In the ordinary course of the Debtors' businesses, the Debtors maintain certain insurance policies that are administered by multiple third-party insurance carriers (the "**Insurance Carriers**"), which provide coverage for, among other things, worker's compensation (as discussed above) and employer's liability, automobile liability, petroleum industry general liability, umbrella liability, directors' and officers' liability, excess directors' and officers' liability, employment practices liability, commercial crime liability, and aviation and pollution liability (collectively, the "**Insurance Policies**").  A detailed list of the Insurance Policies that are currently held by the Debtors is attached to the Insurance and Bonding Motion as Exhibit B.  I believe that the Insurance Policies are essential to the preservation of the Debtors' businesses, property, and assets, and, in some cases, such coverage is required by various federal and state laws and regulations, as well as the terms of the Debtors' various commercial contracts.  It is my understanding that the Insurance Policies provide coverage that is typical in scope and amount for businesses within the Debtors' industry.

137.    The Debtors typically obtain their Insurance Policies through Lockton, pursuant to that certain Fee for Services Agreement between the Debtors and Lockton, dated as of July 1, 2015 (the "**Lockton Contract**").  Among other things, Lockton assists the Debtors in obtaining comprehensive insurance coverage and providing related services.  Lockton also assists with the procurement and negotiation of the Insurance Policies, enabling the Debtors to obtain the Insurance Policies on advantageous terms and at competitive rates.  I have been informed that the Lockton Contract provides for a one-time fee to Lockton of $165,000, which was paid by the Debtors when the Debtors entered into the Lockton Contract on July 8, 2015.

The Debtors also have the right, but not the obligation, to pay Lockton a "Bonus Fee" (the "**Bonus Fee**") of $30,000 pursuant to the terms of the contract for exemplary service, which the Debtors intend to pay.  I believe that payment of the Bonus Fee is in the best interest of the estates because of the importance of maintaining a strong relationship with their insurance and surety bond broker, and the relatively modest fee.  As the Lockton Contract expires on July 1, 2016, payment of the Bonus Fee will minimize any disruption in obtaining future insurance or surety bond coverage.  It is my understanding that should Lockton terminate the Lockton Contract in July, the Debtors would have to seek out their own insurance policies or find a new broker, potentially at greater expense, to assist the Debtors in obtaining comprehensive insurance coverage and providing related services.  Accordingly, the continued employment of Lockton as the Debtors' broker allows the Debtors to obtain the insurance coverage necessary to operate their businesses in a reasonable and prudent manner and to realize savings in the procurement of such policies.

138.  I believe that the maintenance of insurance coverage under the various Insurance Policies on an uninterrupted basis is essential to the continued operation of the Debtors' businesses and is required under the UST Requirements, the federal laws and regulations applicable to the Debtors' businesses, the laws of the various states in which the Debtors operate, and the Debtors' various contractual commitments.  Thus, in the Insurance and Bonding Motion the Debtors submit that they should be authorized to continue to pay premiums, taxes, charges, fees, and other obligations owed under or with respect to the Insurance Policies as such obligations come due in the ordinary course of the Debtors' businesses.

139.    The Debtors request authorization to pay any Prepetition Insurance Obligations to the extent that the Debtors determine, in their sole discretion, that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits, or proceeds provided under the Insurance Policies, and to maintain good relationships with the various Insurance Carriers and the Broker.  I believe the Debtors' maintenance of their relationships with the Insurance Carriers and the Broker is critical to ensuring the continued availability of insurance coverage and reasonable pricing of such coverage for future policy periods.  The Debtors additionally request, out of an abundance of caution, authority to renew or replace the Insurance Policies as they may expire or lapse in the ordinary course.

140.    The Debtors will need to continue their insurance coverage throughout the duration of these Chapter 11 Cases.  I believe that the maintenance of their existing Insurance Policies falls squarely within their ordinary course of business and have been informed that the relief sought in the Insurance and Bonding Motion is only out of an abundance of caution.  To reduce both the administrative burden on these Chapter 11 Cases and the expense of operating as debtors in possession, the Debtors request authorization to maintain, amend, extend or renew the Insurance Policies, as necessary, in the ordinary course of business.

141.    I understand that the total amount paid in annual premiums and payments associated with all of the Insurance Policies is approximately $3,600,000.  The Debtors' Insurance Policies renew at various times throughout each year.  The Debtors pay all of the annual premiums due for each of the policies at the beginning of each particular policy period with the exception of a "control of well" policy.  For the Debtors' control of well policy, the Debtors initially pay a deposit and thereafter pay additional premium fees as needed based on

quarterly drilling activity reported.  The Debtors are not aware of any pending requests for payment under the Insurance Policies.  However, in the event that a request for payment of amounts attributable to the period prior to the Petition Date is outstanding or is received by the Debtors in accordance with the Insurance Policies, in the Insurance and Bonding Motion the Debtors request authority to pay such prepetition amounts in their sole discretion.

142.   Moreover, I believe that it is in the best interests of Debtors' creditors and estates to continue their business relationship with the Broker.  As noted above, the Debtors believe that all payments due and owing to the Broker have been paid in full and the Debtors are not aware of any pending requests for payment under the Lockton Contract.

ii.   The Debtors' Bonding Program

143.   In the ordinary course of business, I understand that the Debtors are required by certain applicable statutes, rules, and regulations to maintain a surety bond program (the "**Bonding Program**"), pursuant to which the Debtors provide surety bonds to certain third parties to secure the Debtors' payment or performance of certain obligations, often to governmental units or other public agencies.  The Bonding Program covers a range of obligations, including, among other things: (a) plugging and abandonment obligations; (b) surface damage obligations; (c) obligations related to state leases; (d) taxes; (e) conservation and environmental obligations; and (f) utilities (the "**Covered Obligations**").  A detailed list of the surety bonds that are currently maintained by the Debtors is attached to the Insurance and Bonding Motion as Exhibit C.  It is my understanding that the Bonding Program provides coverage that is typical in scope and amount for businesses within the Debtors' industry.  The Debtors typically obtain their surety bonds through Lockton.

144.    Statutes or ordinances often require the Debtors to post surety bonds to secure the Covered Obligations.  For example, it is my understanding that an operator of a well must obtain a surety bond in favor of the Bureau of Land Management prior to commencing drilling on oil and gas leases on federally-owned lands.  The Debtors obtained and paid a blanket surety bond in favor of the Bureau of Indian Affairs in connection with drilling operations on certain tribal lands covering all existing wells operated as well as new wells drilled.

145.    The issuance of a surety bond shifts the risk of the Debtors' nonperformance or nonpayment of their obligations covered by the surety bond from the beneficiary of the surety to the surety.  If the Debtors fail to pay Covered Obligations, the applicable surety will pay the Debtors' obligations up to a specified amount.  Unlike an insurance policy, if a surety incurs a loss on a surety bond, the surety is entitled to recover the full amount of that loss from the Debtors.

146.    I believe that the success of the Debtors' efforts to operate effectively and efficiently will depend on the maintenance of the Bonding Program on an uninterrupted basis. No feasible alternative to maintaining the Bonding Program exists.

147.    As of the Petition Date, I understand that the Debtors' outstanding surety bonds were issued by two separate sureties: (a) America First Insurance (two surety bonds totaling approximately $31,000); and (b) US Specialty Insurance (38 surety bonds totaling approximately $5,100,000) (collectively, the "**Sureties**").

148.    The Debtors' outstanding surety bonds secure their performance and obligations in the following general categories and for the following approximate amounts:

| Number of Bonds | Nature of Bond | Approximate Aggregate Bond Amount |
|---|---|---|
| 3 | Oil and Gas Lease Maintenance and Operational Bonds | $80,000 |
| 3 | Lease / Land Use Bonds | $37,500 |
| 3 | Conservation and Environmental Bonds | $60,000 |
| 7 | Utility Bonds | $201,000 |
| 9 | General Performance Obligation Bonds | $970,000 |
| 11 | Well Plugging Bonds (Blanket and Well-Specific) | $3,708,000 |
| 4 | Tax Bonds | $62,500 |
| **40** | **Total** | **$5,119,000** |

149. I understand that the premiums for the surety bonds are generally determined on an annual basis and are paid by the Debtors when the bonds are issued and annually upon renewal. I have been informed that the total amount paid in annual premiums and payments associated with all of the surety bonds is approximately $131,000. As of the Petition Date, the Debtors estimate that all premium payments due and owing under the Bonding Policy have been paid in full and the Debtors are not aware of any pending requests for payment by the Sureties. However, in the event that a request for payment of amounts attributable to the period prior to the Petition Date is outstanding or is received by the Debtors in accordance with the surety bonds, in the Insurance and Bonding Motion the Debtors request authority to pay such prepetition amounts as they deem necessary.

150. I believe that to continue their business operations, the Debtors must be able to provide financial assurances to federal and state governments, regulatory agencies, and other third parties. This in turn requires the Debtors to maintain the existing Bonding Program, including paying the Bonding Obligations as they come due, as well as renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of their businesses,

requesting releases from obsolete bonding obligations, and executing other agreements in connection with the Bonding Program.

151.   Accordingly, I believe it is important that the Debtors be authorized to maintain the Bonding Program in the same manner as maintained prepetition to: (a) pay any Prepetition Bonding Obligations; (b) continue to make all payments for Postpetition Bonding Obligations; and (c) revise, extend, supplement, or change the Bonding Program as needed, including through the issuance of new surety bonds.

### E.   Utilities Motion

152.   In the Utilities Motion, the Debtors request entry of interim and final orders approving procedures that would provide adequate assurance of payment to their utility service providers (the "**Utility Companies**"), while allowing the Debtors to avoid the threat of imminent termination of electricity, water, natural gas, waste removal, telephone, internet, alarm, telecommunication and similar utility products and services (collectively, the "**Utility Services**") from those Utility Companies.  Specifically, the Debtors request entry of interim and final orders (a) approving the Debtors' deposit of $1,400,000 (which is approximately 50% of the estimated monthly cost of the Utility Services based on historical averages over the preceding 12 months) into a newly created, segregated, interest-bearing account, as adequate assurance of postpetition payment to the Utility Companies pursuant to Bankruptcy Code Section 366(b), (b) approving the additional adequate assurance procedures described below as the method for resolving disputes regarding adequate assurance of payment to Utility Companies, and (c) prohibiting the Utility Companies from altering, refusing, or discontinuing services to or discriminating against the Debtors except as may be permitted by the proposed procedures.

153.   I have been informed that, as of the Petition Date, approximately 110 Utility Companies provide Utility Services to the Debtors at various locations through approximately 200 accounts.   The Utility Companies primarily service the Debtors' Headquarters and the Debtors' operations and facilities related to oil and gas production and development in Oklahoma, Texas, and Kansas.   On average, prior to the Petition Date, I understand the Debtors were directly invoiced approximately $2,600,000 each month for utility costs and generally made timely payments.   I am not currently aware of any past due amounts owed to any of the Utility Companies.   Based on the timing of the filings in relation to the Utility Companies' billing cycles, however, there may be prepetition utility costs that have been invoiced to the Debtors for which payment is not yet due and prepetition utility costs for services provided since the end of the last billing cycle that have not yet been invoiced to the Debtors.

154.   I believe the Utility Services are crucial to the continued operations of the Debtors' business.   Where the Debtors serve as the operator pursuant to a Joint Operating Agreement, the Debtors must run their exploration and production equipment at nearly all times in order to effectively operate oil and gas properties, which they would be unable to do without the Utility Services.   Further, the Debtors cannot operate their Headquarters, from which they initiate all required transfers to operators, working interest holders, and royalty interest holders required pursuant to the Joint Operating Agreements to which the Debtors are a party, without the Utility Services.   The failure to make such payments could result in such parties asserting statutory liens or the removal of the Debtors as operator under various Joint Operating Agreements.   Furthermore, the Utility Services are necessary to prevent blowouts and fires from damaging the Debtors' wells and other nearby property.   Accordingly, if the Utility Companies

refuse or discontinue service, even for a brief period, I believe the Debtors' wells could pose a significant safety risk to people and property nearby, the Debtors' business operations would be severely disrupted, and the Debtors could be forced to cease operations.

155.   The Debtors intend to pay all postpetition obligations owed to the Utility Companies in a timely manner.   Nevertheless, to provide additional assurance of payment for future services to the Utility Companies, the Debtors have proposed certain protections and procedures in the Utilities Motion.   Accordingly, I believe that the relief sought in the Utilities Motion is in the best interests of the Debtors and appropriately protects the interests of the Utility Companies.

### F.   Equity Transfer Motion

156.   In the Equity Transfer Motion, the Debtors seek authorization to protect and preserve their Tax Attributes (as defined below) by (a) establishing certain notification and hearing procedures regarding the transfer of Chaparral equity interests that must be complied with before transfers of such equity interests become effective and (b) establishing similar notice and hearing procedures regarding the taking of any worthlessness deduction, for federal or state income tax purposes, with respect to Chaparral common stock.   It is my understanding that these procedures will generally apply to any person or shareholder who owns, directly or indirectly, more than a certain percentage of Chaparral common stock.   I believe that the relief sought in the Equity Transfer Motion will allow the Debtors to monitor certain transfers of, and any worthlessness deductions with respect to, Chaparral equity securities so that the Debtors can act expeditiously to prevent such transfers or deductions, if necessary, and preserve the potential value of their net operating losses ("**NOLs**"), tax credits, and certain other tax attributes

(collectively, "**Tax Attributes**").  I believe that the relief sought by the Equity Transfer Motion is essential to protect the Debtors' valuable Tax Attributes.

157.    The Debtors' Tax Attributes are valuable assets of the Debtors' estates because the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), generally permits a corporation to carry forward such corporation's NOLs and tax credits to offset future taxable income, thereby reducing their U.S. federal income tax liability in future periods.  Depending upon future operating results of the Debtors and absent any intervening limitations prior to the effective date of the Debtors' chapter 11 plan of reorganization, I believe the Debtors' Tax Attributes could allow the Debtors to significantly reduce their future U.S. federal income tax liability, including by offsetting any taxable income that may result from transactions completed in connection with the Debtors' chapter 11 plan of reorganization.  These savings could substantially enhance the Debtors' value and contribute to the Debtors' efforts toward a successful reorganization.

158.    I have been advised that the ability of a corporation to use its Tax Attributes to reduce future U.S. federal income tax liability is subject to certain limitations under section 382 of the Tax Code ("**Section 382**").  It is my understanding that, in general, if a corporation undergoes an "ownership change," Section 382 imposes an annual limitation on the corporation's ability to use its Tax Attributes to offset future taxable income.  Under Section 382, an ownership change occurs when the percentage (by value) of a corporation's equity held by one or more "5-percent shareholders" (as such term is defined in Section 382) increases by more than fifty (50) percentage points over the lowest percentage of stock owned by such shareholders at any time during the preceding three-year period or since the last ownership change, as applicable (the "**Testing Period**").

159.   I have been informed that Section 382 imposes an annual limitation on the amount of taxable income that can be offset by pre-change-of-ownership losses to an amount equal to the long-term tax exempt bond rate (as published monthly by the United States Treasury), as of the ownership change date, multiplied by the value of the stock of the corporation immediately before the ownership change (a "**Section 382 Limitation**").  It is my understanding that under certain circumstances, built-in losses recognized during the five-year period after the ownership change date are subject to similar annual limitations.  Accordingly, an ownership change under Section 382 prior to the effective date of a chapter 11 plan of reorganization may hinder or significantly reduce the ability of the Debtors to use their Tax Attributes on a reorganized basis, thereby resulting in a loss of potential value to the Debtors and the Debtors' estates.

160.   Similarly, I understand that an ownership change may result if a shareholder who beneficially owns 50-percent or more of Chaparral common stock were, for federal or state income tax purposes, to treat the Chaparral common stock held by such shareholder as becoming worthless (*i.e.*, taking a worthless stock deduction with respect to such stock) for any tax year ending prior to the Debtors emerging from chapter 11 protection, under section 382(g)(4)(D) of the Tax Code, such shareholder would be treated as having transferred such stock, which could trigger an ownership change, and thus could adversely affect the Debtors' ability to fully utilize their Tax Attributes.

161.   I believe it is therefore essential that shareholders that own or have owned 50% or more of Chaparral equity securities defer claiming such deduction until after the Debtors have emerged from bankruptcy.  Accordingly, the Debtors request in the Equity Transfer Motion that the Court enter an order restricting the ability of shareholders that own or have owned 50%

or more, by value, of Chaparral equity securities to claim a deduction for the worthlessness of those securities on their federal or state tax returns for a tax year ending before the Debtors emerge from chapter 11 protection.

162.    I believe that the Debtors' Tax Attributes are valuable assets that will inure to the benefit of their stakeholders and facilitate the Debtors' reorganization.  Unrestricted trading in equity securities in Chaparral with no advance warning of such trades or unrestricted deductions for worthless stock would jeopardize and impair the value of these assets.  I believe that the relief requested in the Equity Transfer Motion imposes a minimal burden to achieve a substantial benefit for the Debtors, their creditors, and other interested parties.

## II.    CONTINUING VENDOR MOTIONS

### A.    Operating Expenditures Motion

163.    In the Operating Expenditures Motion, the Debtors seek authority to pay, in their discretion, the prepetition claims of certain Operators, Mineral Contractors, Shippers, Warehousemen, and Mechanics (each as defined below) in connection with the Debtors' operations and Non-Operating Working Interests.  I believe that payments to such parties are essential to the continued operation of the Debtors' businesses because the failure to pay expenses relating to the exploration and production of oil and gas could result in, among other things, the removal of the Debtors as Operators under their Joint Operating Agreements, and in such parties asserting statutory liens against the Debtors' assets on account of their claims.  I understand that such statutory liens may generally be perfected notwithstanding the automatic stay, which would effectively turn such counterparties into secured creditors, who will eventually recover the full amount of their claims in these Chapter 11 Cases.  As such, I believe that the relief sought by the Debtors in the Operating Expenditures Motion will not prejudice

the rights of any creditor and will allow the Debtors to continue their operations in the ordinary course without interruption.

164.   The Debtors hold Working Interests in Oil and Gas Leases in Oklahoma, Texas, and Kansas.  As the holder of these Working Interests, the Debtors are entitled to extract the oil and gas on the lands associated with each particular Working Interest.  I understand that Working Interest Owners often enter Joint Operating Agreements.

165.   The Joint Operating Agreements memorialize the terms under which the oil and gas operations will be conducted, and how revenues received and costs incurred from the joint operations will be split between Working Interest Owners.  The Operator under a Joint Operating Agreement conducts the day-to-day business of producing oil and gas at the site and initially covers the Operating Expenditures on behalf of itself and the Working Interest Owners which are Non-Operators (a "**Non-Operating Working Interest**" and, each Working Interest held by a Non-Operating Working Interest Owner, a "**Non-Operating Working Interest**").  The Operator subsequently seeks reimbursement for each party's *pro rata* share of Operating Expenditures as provided in the Joint Operating Agreements (the "**Joint Interest Billings**").  It is my understanding that Operating Expenditures often include payments to third parties that perform labor or furnish or transport materials, equipment, or supplies used in the drilling, operating, or maintaining of an oil and gas property (the "**Mineral Contractors**").  The Operator is often also responsible for marketing and selling the oil and gas produced.  After selling the oil and gas, the Operator typically distributes the proceeds from the oil and gas to Non-Operating Working Interests Owners in the Unit covered by the Joint Operating Agreement in accordance with each party's interest therein (the "**Working Interest Disbursements**").

166.   I understand that the primary obligation of the Non-Operating Working Interest Owners with respect to a well subject to a Joint Operating Agreement is to pay their Joint Interest Billings to the Operator pursuant to the Joint Operating Agreement.

167.   The Debtors serve as the Operator of approximately 1,900 wells under various Joint Operating Agreements.  As an Operator, it is my understanding that the Debtors are responsible for paying Operating Expenditures and Working Interest Disbursements, and generally receive payment for Joint Interest Billings from Non-Operating Working Interest Owners *after* the Debtors pay Operating Expenditures.  Additionally, where the Debtors hold Non-Operating Working Interests, they are responsible for paying to the Operators the Joint Interest Billings in accordance with their Joint Operating Agreements.

168.   I believe that it is important that the Debtors be able to pay the Mineral Contractors for several reasons.  First, regardless of if and when an Operator is reimbursed by Non-Operating Working Interest Owners, the Operator is obligated to pay the Mineral Contractors and other third parties when due.  It is my understanding that failure to pay Operating Expenditures when due could result in the Operator's removal as Operator under the Joint Operating Agreement.  Second, I have been advised that pursuant to state law, Mineral Contractors are often entitled to statutory liens and, in certain circumstances, constitutional liens on the Operator's interests in the Oil and Gas Leases if the Operator fails to pay them the Operating Expenditures that they are owed.  Therefore, I believe that failure to timely pay Operating Expenditures to Mineral Contractors or any other third parties may result in perfection and enforcement of liens on the Operators' assets in the Unit.

169.   I understand that certain Operating Expenditures are billed to the Debtors through Credit Cards administered by JPM.  The Credit Cards are primarily used by approved

office and field employees that are required to make business-related purchases for the Debtors in the ordinary course of the employee's duties, including, without limitation, purchasing equipment and paying for repairs or services that are necessary for the continuous operation of the Debtors' wells, fleet vehicle fuel, maintenance and repairs, business travel, meals and entertainment, and other Operating Expenditures.  Each Credit Card has a credit limit between $1,500 and $65,000, depending on the employee's title and subject to temporary increases upon approval from a supervisor.  I believe the Credit Cards are critical to the Debtors' field operations by granting the Debtors' employees the flexibility to purchase necessary products quickly.  Failure to pay amounts owed under the Credit Cards when due could result in JPM cancelling the Credit Cards, which I believe could disrupt the Debtors' operations and be administratively burdensome.  I have been informed that the Debtors owe a maximum of $50,000 in prepetition obligations on the Credit Cards as of the Petition Date.  Therefore, I believe that it is important that the Debtors be authorized to continue the use of the Credit Cards in the ordinary course of business and to pay any prepetition obligations associated therewith.

170.    It is my understanding that certain of the Debtors' vendors are paid through single use accounts ("**SUAs**"), which are credit cards issued by JPM to a particular vendor that generally allow the vendor to receive payments on account of goods provided and services rendered more quickly than they would otherwise receive by invoicing the Debtors separately.  After the vendor withdraws money from its SUA, JPM sends an invoice to the Debtors for the amount drawn on the account.  I believe that the SUAs are beneficial to the Debtors not only because they allow certain vendors to receive payment on account of Operating Expenditures owed to them on a more timely basis, which fosters good relationships, but also because the SUAs generally permit the Debtors additional time to make payments

because JPM does not bill the Debtors until a vendor withdraws money from a SUA.  I have been informed that failure to pay amounts owed to JPM on account of the SUAs could result in JPM cancelling the SUAs, which could disrupt the Debtors' operations and harm the Debtors' relationships with its vendors.  I have been informed that there are no amounts owing on account of the SUAs as of the Petition Date.  Accordingly, I believe that the Debtors should be granted authority to continue to use (and allow their vendors to use) the SUAs in the ordinary course of business and to pay any prepetition obligations associated therewith.

171.   In the twelve months preceding the Petition Date, the Debtors paid approximately $215,000,000 in Operating Expenditures (including payments on account of the Credit Cards).   Of that amount, Non-Operating Working Interest Owners reimbursed the Debtors for approximately $40,300,000 on account of Joint Interest Billings.

172.   By the Operating Expenditures Motion, the Debtors seek to pay their undisputed Operating Expenditures owed in the ordinary course of business for which Mineral Contractors or other parties could seek to assert statutory liens.  As of the Petition Date, I have been informed that the Debtors have approximately $37,000,000 of Operating Expenditures outstanding, for which they expect to be reimbursed approximately $13,200,000 by holders of Non-Operating Working Interests.  The Debtors request approval to pay up to $27,000,000 of the prepetition Operating Expenditures upon entry of an interim order, and up to $37,000,000 upon entry of the final order.   The Debtors further request approval to pay any and all prepetition amounts outstanding on the Credit Cards on account of Operating Expenditures.

173.   The Debtors hold Non-Operating Working Interests in 2,800 wells for which third parties serve as Operators.  In such instances, I understand that the Debtors receive payment from Operators representing their share of production revenues.  The Debtors, in turn,

70

must timely pay the Operators the Joint Interest Billings in accordance with the Joint Operating Agreements.

174.    Where the Debtors hold a Non-Operating Working Interest, I understand that the Joint Operating Agreement and applicable law often grant the Operator a contractual or statutory lien on the Debtors' Non-Operating Working Interest to secure the Debtors' payment obligations owed to the Operator.  As such, failure to timely pay the Joint Interest Billings may result in Operators asserting liens on the Debtors' interests in the wells, the Oil and Gas Leases, or the Debtors' *pro rata* portion of the production or revenue therefrom.

175.    I have been informed that in the twelve months preceding the Petition Date, the Debtors paid approximately $58,200,000 in Joint Interest Billings.  As of the Petition Date, the Debtors estimate that they have approximately $6,500,000 of prepetition Joint Interest Billings incurred but not invoiced or paid under the terms of their Joint Operating Agreements. To preserve and protect their share of production and revenue from these properties and maintain their relationships with the Operators of these properties, both during and after the pendency of these Chapter 11 Cases, by the Operating Expenditures Motion the Debtors request approval to pay up to $5,000,000 in prepetition Joint Interest Billings on an interim basis, and up to $6,500,000 on a final basis.

176.    In the ordinary course of business, the Debtors may use certain vendors (the "**Warehousemen**") to store drill pipe, a company airplane, and other related equipment when it is not being used in operations.  Further, in the ordinary course of business, the Debtors may use certain mechanics and materialmen (the "**Mechanics**") to perform maintenance and other services on the company aircraft and related equipment.  Under applicable state laws, it is my understanding that Warehousemen generally have a lien on the goods in their possession

securing the charges or expenses incurred in connection with the storage of those goods. Similarly, I understand that under applicable state laws, Mechanics generally have a lien against property serviced by the Mechanic securing the charges or expenses incurred in connection with the maintenance or servicing of such property.   I have been informed that the Shippers, Warehousemen and Mechanics may have outstanding invoices totaling approximately $50,000 on account of their prepetition claims (the "**Shippers, Warehousemen and Mechanics Claims**").

177.   If the Debtors do not pay the Shippers, Warehousemen and Mechanics Claims on a timely basis, I believe that the Shippers, Warehousemen and Mechanics may assert possessory liens on the goods or raw materials currently in their possession or serviced by them and refuse to deliver or release such goods until their invoices are paid.   The refusal of the Shippers, Warehousemen or Mechanics to deliver, return, or grant access to the Debtors' drilling pipes and company airplane as a result of not being paid would result in an immediate destruction of value of the Debtors' estates, and could potentially cost the Debtors a substantial amount of revenue and future business as the Shippers, Warehousemen and Mechanics could assert liens against the Debtors' property.   Accordingly, I believe it is important that the Debtors receive authorization, but not direction, to honor outstanding invoices related to prepetition services provided by the Shippers, Warehousemen and Mechanics up to $20,000 on an interim basis, and up to $50,000 on a final basis.

B.    **Critical Vendor Motion**

178.    As described above, the Debtors' ongoing businesses are dependent upon their ability to continue to operate their oil and gas wells, which, in turn, is dependent upon the Debtors' access to various essential goods and services.  As such, I believe that payment of the Critical Vendor Claims is vital to the Debtors' ability to engage in their oil and gas operations and, thus, to their effort to preserve and maximize value for all stakeholders.

179.    I believe that some of the Debtors' vendors and service providers will continue to do business with them after commencement of these cases because doing so simply makes good business sense.  In many cases, however, I anticipate that certain Critical Vendors will: (a) refuse to deliver goods and services without payment of their prepetition claims; or (b) refuse to deliver goods and services on reasonable price or credit terms absent payment of prepetition claims, thereby effectively refusing to do business with the Debtors.  Accordingly, I believe it is essential that the Debtors receive authorization to pay the Critical Vendor Claims of such vendors and service providers, subject to the criteria specified in the Critical Vendors Motion, because payment of such claims is necessary to achieve their chapter 11 objectives and preserve value for their various constituencies.

180.    I have been informed that to ensure that the Debtors correctly identify their Critical Vendors, certain of the Debtors' employees and professionals who are responsible for maintaining, and have intimate knowledge of, the Debtors' vendor and service provider relationships, have conducted, and will continue to conduct, an extensive analysis and review of the Debtors' immediate needs for goods and services.

181.    I understand that, as part of such analysis and review, the Debtors have used, and will continue to use, the following criteria to determine which of the Debtors' vendors

73

and service providers are Critical Vendors: (a) whether the vendor or service provider is a sole-source provider; (b) whether the Debtors receive advantageous pricing or other terms from a vendor or service provider such that a postpetition replacement would result in significantly higher costs; (c) whether quality requirements, geographic constraints, customizations, or other specifications prevent the Debtors from obtaining the necessary goods or services from alternative sources within a reasonable timeframe; (d) whether, if the vendor is not a sole source provider, the Debtors have insufficient inventory of goods or in-house capabilities to continue operations while a replacement is found and put into place; (e) whether a vendor or service provider is contractually obligated to continue to provide goods and services but the Debtors cannot afford the time and expense of an enforcement action if the vendor or service provider wrongfully refuses to perform, and in fact refuses to perform; (f) whether a vendor or service provider has possession of goods, products, or other deliverables as to which they are able to claim a possessory lien and, thus, to decline to deliver such items to the Debtors without payment; (g) whether a vendors' prepetition claim is entitled to administrative expense status under Bankruptcy Code Section 503(b)(9); and (h) whether a vendor or service provider meeting any of the aforementioned standards in (a) through (g) refuses to, demands pricing or trade terms that constitute an effective refusal to, or is likely financially unable to, provide goods or services to the Debtors on a postpetition basis if the prepetition balances are not paid. I am confident that this process has appropriately identified, and will continue to appropriately identify, only those vendors and service providers that are critical to the estates.

182.    Among the types of Critical Vendors identified by the Debtors are certain providers of essential parts, equipment and services used in the operation of the Debtors' businesses.  I believe that these vendors are critical to the Debtors' businesses because they (i)

possess unique technical knowledge regarding the Debtors' oil and gas leases and operations, (ii) have familiarity with the Debtors' equipment, (iii) provide unique goods and services to the Debtors that are essential to the Debtors' operations, or (iv) provide some combination of the foregoing.  I believe that even in those instances where the Debtors could potentially find a replacement vendor to provide the goods or services necessary to maintain and operate their businesses, time and other factors involved in replacing such Critical Vendors would be disruptive, cost-prohibitive and, in certain instances, impossible.

183.   As discussed above, the Debtors derive a substantial portion of their revenue from the sale of oil and natural gas from wells operated by the Debtors.  Therefore, I believe any delay in the provision of integral parts and equipment, or servicing of the Debtors' equipment or wells, and any disruption to the relationship between the Debtors and these Critical Vendors would cause irreparable harm to the Debtors' businesses.

184.   Vendors and service providers of the nature described above, and others that satisfy the criteria described above, fall under the rubric of Critical Vendors.  I believe that there is a high likelihood that such Critical Vendors would no longer do business with the Debtors if they are not paid on account of any outstanding prepetition claims.  Any refusal by the Critical Vendors to provide essential goods or perform key services would have immediate and severe adverse repercussions, including, but not limited to, jeopardizing or impairing the value of the Debtors' businesses.

185.   Under these circumstances, I believe that paying the Critical Vendor Claims is both necessary and essential to the Debtors' ability to achieve their chapter 11 objectives and preserve value for their various constituencies.

186.   I have been informed that approximately $7,500,000 is owed to Critical Vendors as of the Petition Date.   Accordingly, in the Critical Vendors Motion the Debtors request authority to make payments on account of Critical Vendor Claims in an aggregate amount of up to $7,500,000 in the event that certain Critical Vendors did not provide the Debtors with invoices prior to the Petition Date for all prepetition amounts owed.

187.   I understand that the Debtors will attempt to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to continue supplying goods or services to the Debtors on trade terms that are the same or better than the trade terms that existed immediately prior to the Petition Date or, if more favorable, within the 60 day period prior to the Petition Date (the "**Customary Trade Terms**").   The Debtors reserve the right to negotiate new trade terms (the "**Minimum Credit Terms**") with any Critical Vendor as a condition to payment of any Critical Vendor Claim, in the Debtors' sole discretion.

188.   I understand that to ensure that the Critical Vendors deal with the Debtors on either Customary Trade Terms or Minimum Credit Terms, the Debtors propose that a letter agreement (a "**Trade Agreement**") be sent to the Critical Vendors for execution, together with a copy of the Order granting the Critical Vendors Motion.

189.   In the Critical Vendors Motion, the Debtors request only the authorization to enter into Trade Agreements when the Debtors determine, in their sole discretion, that payment of such Critical Vendor Claims is necessary to enable the Debtors to realize their chapter 11 objectives and that such Trade Agreements are advisable.   The Debtors also request authorization to make payments on account of Critical Vendor Claims in the absence of a Trade Agreement if the Debtors determine, in their business judgment, that failure to pay such Critical Vendor Claims will result in harm to the Debtors' business operations and there is no

reasonable likelihood that the Debtors will negotiate an acceptable Trade Agreement with the applicable vendors and/or service providers.

190.   I understand that by agreeing to provide Customary Trade Terms or Minimum Credit Terms, the Critical Vendors are extending unsecured postpetition credit to the Debtors for the benefit of all creditors.  I have been advised that such Customary Trade Terms or Minimum Credit Terms maintain the credit terms that the Debtors had prior to the Petition Date, or provide other acceptable credit terms, and may provide the Debtors with more favorable terms for unsecured credit than currently provided by the Critical Vendors or available elsewhere.  Accordingly, I believe that the treatment of the valid Critical Vendor Claims set forth in the Critical Vendors Motion in exchange for Customary Trade Terms or Minimum Credit Terms is in the best interests of the Debtors and their estates and should be approved.

191.   I understand that in the event that a Critical Vendor under a Trade Agreement refuses to supply goods and/or services to the Debtors on Customary Trade Terms or Minimum Credit Terms (or such other terms as are agreed by the parties) following receipt of payment on its Critical Vendor Claim, or otherwise fails to comply with its Trade Agreement with the Debtors, the Debtors reserve their rights to return the parties to the positions they held immediately prior to entry of the Order approving this Motion with respect to all prepetition claims.  Further, in the Critical Vendor Motion the Debtors request authorization, in their sole discretion and without further order of the Court to: (a) declare that any Trade Agreement between the Debtors and such Critical Vendor is terminated; (b) declare that payments made to such Critical Vendor on account of its Critical Vendor Claims be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of such Critical

Vendor without further order of the Court or action by any person or entity; and (c) recover or seek disgorgement of any payment made to such Critical Vendor on account of its Critical Vendor Claims to the extent that such payments exceed the postpetition claims of such Critical Vendor, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense.  In addition, the Debtors reserve the right to seek damages or other appropriate remedies against any breaching Critical Vendor.

192.   In the Critical Vendors Motion, the Debtors further propose that any Trade Agreement terminated as a result of a Critical Vendor's refusal to comply with the terms thereof may be reinstated if the underlying default under the Trade Agreement is fully cured by the Critical Vendor not later than five (5) business days following the Debtors' notification to the Critical Vendor of such a default; or the Debtors, in their sole discretion, reach a favorable alternative agreement with the Critical Vendor.

193.   I believe that the relief requested in the Critical Vendor Motion is necessary to permit the Debtors to obtain the timely delivery of goods from the Critical Vendors and uninterrupted provision of services from the Suppliers.

C.    **Royalty Motion**

194.   For the reasons stated below, the Debtors seek entry of interim and final orders authorizing the Debtors to pay in the ordinary course of business, whether such obligations were incurred prepetition or will be incurred postpetition, (i) Royalty Payments, (ii) Working Interest Disbursements and (iii) Lease Obligations.

195.   As noted above, the Debtors hold Working Interests in Oil and Gas Leases.  Where the Debtors operate wells pursuant to a Joint Operating Agreement, the Debtors are obligated to make certain payments to Royalty Interest Owners (as defined below), Working

Interest Owners and other parties.   Under applicable state law and the Bankruptcy Code, Royalty Interests (as defined below) and Working Interests may not be considered to be property of the Debtors' estate, and, therefore, it is my understanding that the Debtors hold payments on account of such interests in trust for the benefit of Royalty Interest Owners and Working Interest Owners.   Accordingly, it is my understanding that such payments may not be distributable to the Debtors' creditors.   For the same reasons, I have been informed that it is unclear whether the automatic stay would prevent Royalty Interest Owners and Working Interest Owners from bringing actions against the Debtors or asserting liens against the Debtors' assets to recover or protect amounts owed on account of such owners' interests.   As such, I believe that the relief sought in the Royalty Motion will not prejudice the rights of any creditor, and will allow the Debtors to continue their operations in the ordinary course without interruption.

> i.   Royalty Interests

196.    The Debtors are parties to approximately 13,700 Oil and Gas Leases, each of which is subject to or burdened by one or more types of interests retained by the owners of the mineral interests ("**Mineral Interest Owners**").   It is my understanding that the nature of the interest retained by the Mineral Interest Owners creating a Royalty Payment obligation can take many forms, including landowner's royalty interests, overriding royalty interests, net profits interests, non-participating royalty interests and production payments (collectively, the "**Royalty Interests**").   Each of the Royalty Interests represents a share of the oil and gas produced from the property, or the revenue derived from the sale of such production, subject to the corresponding Oil and Gas Lease.   Through the Oil and Gas Lease, the Mineral Owner receives a Lease Bonus and Royalty Payments.   In addition to the Royalty Payments and Lease Bonuses, I understand that Oil and Gas Leases often provide for the payment of delay rental

payments, shut-in payment, lease extension payments, minimum royalty payments and similar payments ("**Non-Royalty Lease Payments**").   In each case, owners of Royalty Interests ("**Royalty Interest Owners**") are not obligated to pay any of the costs associated with exploration or production of oil and gas.  Royalty Interest Owners are only entitled to receive Royalty Payments, either in cash or in kind, on account of their Royalty Interests after the production of oil, gas or both has begun.  However, the Royalty Interest Owner may be entitled to Lease Bonus payments or Non-Royalty Lease Payments prior to production of oil or gas.

197.   It is my understanding that Royalty Payments are commonly governed by state statutory frameworks that set strict payment deadlines and contain enforcement mechanisms including interest, fines, recovery of costs and attorneys' fees and treble damages. Failure to make such payments can also result in actions seeking the forfeiture, cancellation or termination of the Oil and Gas Leases under the terms of the Oil and Gas Lease.

198.   The Debtors primarily make Royalty Payments on account of Oil and Gas Leases in which the Debtors serve as the Operator.  In Oil and Gas Leases where the Debtors hold only a Non-Operating Working Interest, Royalty Payments generally are paid by a third-party Operator before the Debtors receive their periodic *pro rata* Working Interest Disbursements.

199.   Over the last 12 months, the Debtors made approximately 6,000 Royalty Payments each month.  Although it is my understanding that the average monthly amount of Royalty Payments paid by the Debtors varies based on actual production, over the last 12 months, the Debtors paid approximately $4,400,000 in Royalty Payments each month.  The Debtors are required to make Working Interest Disbursements to Royalty Interests Owners by the end of the month following the month during which the first purchaser remitted payment.

As such, I have been informed that, as of the Petition Date, there are approximately $11,700,000 in unpaid prepetition Royalty Payments.  Accordingly, in the Royalty Motion the Debtors request authority to remit (i) up to $6,800,000 of such prepetition Royalty Payments on an interim basis, and (ii) any and all prepetition Royalty Payments upon entry of the Final Order granting the relief requested in the Royalty Motion, and to continue making such Royalty Payments in the ordinary course of business on a postpetition basis.  I believe that granting the requested relief will merely affect the timing of Royalty Payments and that Royalty Interest Owners will not receive more than they would otherwise be entitled to receive under applicable state law or the Bankruptcy Code.

ii.    Working Interests and Working Interest Disbursements

200.    As discussed above, Working Interests are created when a Mineral Interest Owner conveys its rights to extract minerals from its land to a third party.  Unlike Royalty Interest Owners, I understand that Working Interest Owners bear the cost of exploration, development and operation of the property.

201.    Where the Debtors serve as the Operator pursuant to Joint Operating Agreements covering both the Debtors' Working Interests and the Working Interests of third-parties, they sell their production to "first purchasers."  Typically, first purchasers remit payment to the Debtors for purchased oil and gas on the last day of the month following production.  The Debtors are required to make Working Interest Disbursements to Non-Operating Working Interests Owners by the end of the month following the month during which the first purchaser remitted payment.  Over the last twelve (12) months, the Debtors generated approximately $27,000,000 in revenue each month from operations on Oil and Gas Leases for which the Debtors serve as the Operator.  These revenues were then divided among the Debtors,

Working Interest Owners and Royalty Interest Owners through the payment of Working Interest Disbursements.

202.   As an Operator, the Debtors are responsible for making Working Interest Disbursements.   It is my understanding that pursuant to state law, the Working Interest Disbursements held by the Debtors prior to remittance to the appropriate Working Interest Owners may not be property of the Debtors' estates.   I am advised that failure to make Working Interest Disbursements could expose the Debtors to the statutory enforcement mechanisms discussed above.   Additionally, I have been advised that Non-Operating Working Interest Owners often have contractual remedies under the applicable Joint Operating Agreement, including the grant of a security interest in production, the right to remove the Debtor as Operator, and the right to interest payments on the amount owed.

203.   In the twelve (12) months preceding the Petition Date, the Debtors remitted approximately $38,100,000 in Working Interest Disbursements.   It is my understanding that Working Interest Disbursements are not uniform or entirely predictable on a month-to-month basis.

204.   By the Royalty Motion the Debtors request authorization from the Court to remit undisputed, prepetition Working Interest Disbursements in the Debtors' ordinary course of business.   I have been informed that as of the Petition Date, the Debtors have generated and currently hold prepetition Working Interest Disbursements owed to Working Interest Owners in the approximate amount of $6,600,000.   The Debtors request authority to remit (i) up to $5,500,000 of such prepetition Working Interest Disbursements on an interim basis and (ii) any and all prepetition Working Interest Disbursements upon entry of the Final Order granting the relief requested in the Royalty Motion, and to continue making such Working Interest

Disbursements in the ordinary course of business on a postpetition basis. I believe that granting the requested relief will merely affect the timing of Working Interest Disbursements and that Working Interest Owners will not receive more than they would otherwise be entitled to receive under applicable state law or the Bankruptcy Code.

        iii.   <u>Lease Obligations</u>

205. As described in greater detail below, in circumstances in which the Debtors receive revenues from first purchasers and remit and distribute revenues, I understand that the Debtors are required to pay certain taxes and make certain payments on behalf of Royalty Interest Owners and Working Interest Owners.

206. It is my understanding that the Debtors are required to pay certain withholding taxes imposed on royalty proceeds (the "**Withholding Taxes**"). The Withholding Taxes are a form of income tax, and are paid to the Internal Revenue Service, the applicable taxing authority, by the Debtors on behalf of Royalty Interest Owners and Working Interest Owners.

207. The Debtors are also required to pay taxes imposed in connection with the removal of nonrenewable resources such as crude oil and natural gas (the "**Severance Taxes**") to certain taxing authorities each month. I understand that typically, the Operator is responsible for the payment of all Severance Taxes on behalf of all Royalty Interest Owners and Working Interest Owners the *pro rata* portion of such taxes that was withheld from the Royalty Interest Owners and Working Interest Owners in the revenue distribution process. I am advised that failure to pay the Severance Taxes when due could result in penalties, liens to secure payment of outstanding Severance Taxes, and disruption of the Operator's operations.

208. It is my understanding that in certain circumstances, an Operator may be entitled to a refund of a portion of the Severance Taxes (the "**Severance Tax Refunds**"). For

example, an Operator may be entitled to a Severance Tax Refund upon review and approval of the applicable taxing authority for certain qualifying producing wells including but not limited to horizontally drilled wells, enhanced oil recovery projects, high-cost gas wells, and economically at-risk wells.  If an Operator receives a Severance Tax Refund, the Operator must remit the *pro rata* share of the refund to each respective Royalty Interest Owner or Working Interest Owner in the well or Unit.

209.    Working Interest Owners may also be required to make payments to Oil and Gas Lease lessors in addition to Royalty Payments, including but not limited to Non-Royalty Lease Payments such as delay rental payments, lease extension payments, shut-in royalty payments, minimum royalty payments (such Non-Royalty Lease Payments, collectively with the Withholding Taxes, the Severance Taxes and the Severance Tax Refunds, the "**Lease Obligations**"; and the Lease Obligations, collectively with the Royalty Payments and the Working Interest Disbursements, the "**Obligations**").  It is my understanding that the payment of the Delay Rentals effectively postpones the Working Interest Holder's obligation to explore and develop the leased property for the period for which the Delay Rentals are paid.  Thus, if the Delay Rentals are paid on or before the anniversary date for each year during the primary term of a particular Oil and Gas Lease, then such Oil and Gas Lease will remain in full force and effect and the Working Interest Holder will not be required to engage in exploration and development.  If the Delay Rentals are not paid and the Working Interest Owner does not engage in initial exploration and development, the Oil and Gas Lease may terminate.  Accordingly, I believe that failure to pay the Delay Rentals could similarly have a material adverse effect upon all Working Interest Owners, including, inter alia, the loss of the underlying Oil and Gas Lease.

210.    Likewise, it is my understanding that failure to make shut-in payments could cause the Oil and Gas Lease to terminate.  The term of an Oil and Gas Lease is typically for a period of years (the primary term), and as long thereafter as oil and gas are produced. Where a well is capable of producing oil or gas, but an Operator does not actually produce such oil or gas, the Oil and Gas Lease terminates by its own terms.  By making a shut-in payment, a Working Interest Owner can fulfill production obligations under the Oil and Gas Lease and avoid termination.  Accordingly, I believe that failure to pay the shut-in payments could have a material adverse effect upon all Working Interest Owners, including, inter alia, the loss of the underlying Oil and Gas Lease.

211.    Where the Debtors serve as Operator, I understand that the Debtors are obligated to pay the Lease Obligations on behalf of itself and Non-Operating Working Interest Owners pursuant to the terms of the applicable Oil and Gas Leases and Joint Operating Agreements, respectively.  As of the Petition Date, I have been informed that the Debtors owe approximately $1,000,000 on account of prepetition Lease Obligations.  Accordingly, in the Royalty Motion the Debtors request authority to remit (i) up to $750,000 of such prepetition Lease Obligations, on an interim basis and (ii) any and all prepetition Lease Obligations upon entry of the Final Order granting the relief requested therein, and to continue making such Lease Obligations payments in the ordinary course of business on a postpetition basis.  I believe that granting the requested relief will merely affect the timing of Lease Obligations and that parties receiving such Lease Obligation payments will not receive more than they would otherwise be entitled to receive under applicable state law or the Bankruptcy Code.

**III.    CONCLUSION**

212.    The Debtors' ultimate goal in these Chapter 11 Cases is the maximization of estate value through a plan process contemplating a conversion of the Unsecured Notes to equity in the reorganized Debtors.  In the near term, however, to minimize any loss of value of their businesses during these Chapter 11 Cases, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the early stages of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and confirmation of a Chapter 11 plan will be substantially enhanced.

213.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of May 2016.

Chaparral Energy, Inc.
Debtors and Debtors in Possession

Mark A. Fischer
Chief Executive Officer
Chaparral Energy, Inc.

## **Exhibit A**

Chaparral Energy, Inc. Organizational Chart

