## Exhibit D

**New Registration Rights Agreement**

US-DOCS\80311660.3

**REGISTRATION RIGHTS AGREEMENT**

This Registration Rights Agreement (including all exhibits hereto and as may be amended, supplemented or amended and restated from time to time in accordance with the terms hereof, this "*Agreement*") is made and entered into as of [●], 2017, by and among Chaparral Energy, Inc., a Delaware corporation (the "*Company*"), on one hand, and the other parties signatory hereto and any additional parties identified on the signature pages of any joinder agreement executed and delivered pursuant hereto, on the other hand (each a "*Holder*" and collectively, the "*Holders*").

WHEREAS, the Company and certain affiliated debtors (collectively, the "*Debtors*") filed a Plan of Reorganization pursuant to Chapter 11 of the United States Bankruptcy Code, on December 19, 2016 which, as amended, was confirmed by the United States Bankruptcy Court for the District of Delaware on [●], 2017 (including all exhibits, schedules and supplements thereto and as amended from time to time, the "*Plan*"); and

WHEREAS, the Plan provides that any recipient of shares of Common Stock (as defined below) of the Company that, together with any Affiliates (as defined below) or a Related Fund (as defined below) that is a party to the Backstop Commitment Agreement will enter into a registration rights agreement substantially in the form included in the Plan; and

WHEREAS, the Company and the Holders have agreed to enter into this Agreement pursuant to which the Company shall grant the Holders registration rights with respect to the Registrable Securities in furtherance of the foregoing.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and each of the Holders agree as follows:

1.      <u>Definitions</u>. Capitalized terms used and not otherwise defined herein that are defined in the Plan have the meanings given such terms in the Plan. As used in this Agreement, the following terms shall have the following meanings:

"*Advice*" has the meaning set forth in <u>Section 16(c)</u>.

"*Affiliate*" means, with respect to any person, any other person which directly or indirectly controls, is controlled by, or is under common control with, such person. The term "control" (including the terms "controlled by" and "under common control with") as used in this definition means the possession, directly or indirectly (including through one or more intermediaries), of the power or authority to direct or cause the direction of management, whether through the ownership of voting securities, by contract or otherwise.

"*Agreement*" has the meaning set forth in the Preamble.

"*Automatic Shelf Registration Statement*" means an "automatic shelf registration statement" as defined in Rule 405 promulgated under the Securities Act, as such definition may be amended from time to time.

#4826-8994-0026

"*Backstop Commitment Agreement*" means that certain Backstop Commitment Agreement dated as of December 15, 2016 by and among the Company and the certain commitment parties thereto.

"*beneficially own*" (and related terms such as "beneficial ownership" and "beneficial owner") shall have the meaning given to such term in Rule 13d-3 under the Exchange Act, and any Person's beneficial ownership of securities shall be calculated in accordance with the provisions of such Rule.

"*Board*" means the Board of Directors of the Company.

"*Business Day*" means any day, other than a Saturday or Sunday or a day on which commercial banks in New York City are required by law to be closed.

"*Class A Shares*" means shares of the Company's Class A common stock, par value $0.01 per share, and any securities into which such shares may hereinafter be reclassified.

"*Class B Shares*" means shares of the Company's Class B common stock, par value $0.01 per share, and any securities into which such shares may hereinafter be reclassified.

"*Commission*" means the Securities and Exchange Commission.

"*Common Stock*" means the Class A Shares and Class B Shares, collectively.

"*Company*" has the meaning set forth in the Preamble.

"*Counsel to the Holders*" means (i) with respect to any Demand Registration, the one legal counsel selected by the Holders of a majority of the Registrable Securities initially requesting such Demand Registration and (ii) with respect to any Underwritten Takedown or Piggyback Registration, the one legal counsel selected by the Majority Holders.

"*Demand Registration Request*" has the meaning set forth in Section 4(a).

"*Effective Date*" means the date that a Registration Statement filed pursuant to this Agreement is first declared effective by the Commission.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"*Form S-1*" means form S-1 under the Securities Act, or any other form hereafter adopted by the Commission for the general registration of securities under the Securities Act.

"*Form S-3*" means form S-3 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-3.

"*Form S-4*" means form S-4 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-4.

#4826-8994-0026

"*Form S-8*" means form S-8 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-8.

"*FINRA*" has the meaning set forth in Section 10.

"*Grace Period*" has the meaning set forth in Section 6(a)(B).

"*Holder*" or "*Holders*" has the meaning set forth in the Preamble. A Person shall cease to be a Holder hereunder at such time as it ceases to hold any Registrable Securities.

"*Indemnified Party*" has the meaning set forth in Section 12(c).

"*Indemnifying Party*" has the meaning set forth in Section 12(c).

"*Initial Registrable Securities Number*" means the aggregate number of Registrable Securities (including Warrant Shares) beneficially owned by all signatories to this Agreement other than the Company.

"*Initial Shelf Expiration Date*" has the meaning set forth in Section 2(e)(ii).

"*Initial Shelf Registration Statement*" has the meaning set forth in Section 2(a).

"*Lockup Period*" has the meaning set forth in Section 11(a).

"*Losses*" has the meaning set forth in Section 12(a).

"*Majority Holders*" means, with respect to any Underwritten Offering, the holders of a majority of the Registrable Securities to be included in such Underwritten Offering held by all Holders that have made the request requiring the Company to conduct such Underwritten Offering (but not including any Holders that have exercised "piggyback" rights hereunder to be included in such Underwritten Offering).

"*Other Holders*" has the meaning set forth in Section 7(b).

"*Person*" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"*Piggyback Notice*" has the meaning set forth in Section 7(a).

"*Piggyback Offering*" has the meaning set forth in Section 7(a).

"*Plan*" has the meaning set forth in the Preamble.

"*Plan Effective Date*" shall mean the date on which the Plan becomes effective.

"*Proceeding*" means an action, claim, suit, investigation or proceeding (including, without limitation, an investigation or partial proceeding, such as a deposition), whether commenced or threatened.

3

#4826-8994-0026

"*Prospectus*" means any prospectus included in a Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by a Registration Statement, and all other amendments and supplements to the prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such prospectus.

"*Registrable Securities*" means, collectively, (a) as of the Plan Effective Date, (i) all shares of Common Stock issued to any Holder or to any Affiliate or Related Fund of any Holder, either directly or pursuant to a joinder or assignment, (ii) the Warrant Shares acquired by a Holder pursuant to the Plan, (b) any additional shares of Common Stock or Warrant Shares acquired by any Holder, Affiliate or Related Fund of any Holder in open market or other purchases after the Plan Effective Date and (c) any additional shares of Common Stock or Warrant Shares paid, issued or distributed in respect of any such shares of Common Stock or Warrants by way of a stock dividend, stock split or distribution, or in connection with a combination of shares, and any security into which such Common Stock or Warrant Shares will have been converted or exchanged in connection with a recapitalization, reorganization, reclassification, merger, consolidation, exchange, distribution or otherwise; provided, however, that as to any Registrable Securities, such securities shall cease to constitute Registrable Securities upon the earliest to occur of: (x) the date on which such securities are disposed of pursuant to an effective Registration Statement; (y) the date on which such securities are disposed of pursuant to Rule 144 (or any similar provision then in effect) promulgated under the Securities Act; and (z) the date on which such Registrable Securities cease to be outstanding.

"*Registration Statement*" means any one or more registration statements of the Company filed under the Securities Act that covers the resale of any of the Registrable Securities pursuant to the provisions of this Agreement (including without limitation any Shelf Registration Statement), amendments and supplements to such Registration Statements, including post-effective amendments, all exhibits and all material incorporated by reference or deemed to be incorporated by reference in such Registration Statements.

"*Related Fund*" means, with respect to any Person: (i) any fund, account or investment vehicle that is controlled or managed by such Person, by any Affiliate of such Person, or, if applicable, such Person's investment manager and (ii) any investment manager referred to in clause (i) of this definition.

"*Rule 144*" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"*Rule 158*" means Rule 158 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

4

"*Rule 415*" means Rule 415 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"*Rule 424*" means Rule 424 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"*Selling Stockholder Questionnaire*" means a questionnaire reasonably adopted by the Company from time to time.

"*Shelf Registration Statement*" means a Registration Statement filed with the Commission in accordance with the Securities Act for the offer and sale of Registrable Securities by Holders on a continuous or delayed basis pursuant to Rule 415.

"*Transfer*" has the meaning set forth in Section 144.

"*Underwritten Offering*" means an offering of Registrable Securities under a Registration Statement in which the Registrable Securities are sold to an underwriter for reoffering to the public.

"*Underwritten Takedown*" has the meaning set forth in Section 5(a).

"*Warrants*" means the warrants to purchase Class A Shares to be issued to Mark A. Fischer, representing an aggregate total of [1.5]% of the total number of Class A Shares issuable pursuant to the Plan.

"*Warrant Shares*" means the Class A Shares issuable pursuant to the exercise of the Warrants.

2.      Initial Shelf Registration.

(a)      The Company shall prepare a Shelf Registration Statement (the "*Initial Shelf Registration Statement*"), and shall include in the Initial Shelf Registration Statement the Registrable Securities of each Holder who shall request inclusion therein of some or all of their Registrable Securities by checking the appropriate box on the signature page of such Holder hereto or by written notice to the Company no later than forty-five (45) days after the Plan Effective Date.  The Company shall file the Initial Shelf Registration Statement with the Commission as promptly as practicable and in any event not later than the sixtieth (60th) day following the Plan Effective Date.

(b)      Once in every six month period, Holders of shares of Common Stock that are Registrable Securities pursuant to clause (b) of the definition of "Registrable Securities" may request, in writing, inclusion of such Registrable Securities in the Initial Shelf Registration

5

Statement and upon such request, the Company shall include such Registrable Securities in the Initial Registration Statement.

(c)     The Company shall include in the Initial Shelf Registration Statement all Registrable Securities whose inclusion has been timely requested as aforesaid in Sections 2(a) and (b); *provided, however,* that the Company shall not be required to include an amount of Registrable Securities in excess of the amount as may be permitted to be included in such Registration Statement under the rules and regulations of the Commission and the applicable interpretations thereof by the staff of the Commission.

(d)     The Initial Shelf Registration Statement shall be on Form S-1; *provided, however*, that, if the Company becomes eligible to register the Registrable Securities for resale by the Holders on Form S-3 (including without limitation a Form S-3 filed as an Automatic Shelf Registration Statement), the Company shall be entitled to amend the Initial Shelf Registration Statement to a Shelf Registration Statement on Form S-3 or file a Shelf Registration Statement on Form S-3 in substitution of the Initial Shelf Registration Statement as initially filed.

(e)     The Company shall use its reasonable best efforts to cause the Initial Shelf Registration Statement to be declared effective by the Commission as promptly as practicable following filing with the Commission, and shall use its reasonable best efforts to keep such Shelf Registration Statement continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission, until the earlier of (i) the date the Company (A) is eligible to register the Registrable Securities for resale by the Holders on Form S-3 and (B) has filed such Registration Statement described in Section 2(e)(i)(A) with the Commission and such Registration Statement has been declared effective; and (ii) the date that all Registrable Securities covered by the Initial Shelf Registration Statement shall cease to be Registrable Securities (such earlier date, the "*Initial Shelf Expiration Date*"). In the event of any stop order, injunction or other similar order or requirement of the Commission relating to the Initial Shelf Registration Statement, if any Registrable Securities covered by the Initial Shelf Registration Statement remain unsold, the period during which the Initial Shelf Registration Statement shall be required to remain effective will be extended by the number of days during which such stop order, injunction or similar order or requirement is in effect.

(f)     If the Initial Shelf Registration Statement is on Form S-1, then for so long as any Registrable Securities covered by the Initial Shelf Registration Statement remain unsold, the Company will file any supplements to the Prospectus contained therein or post-effective amendments required to be filed by applicable law in order to incorporate into such Prospectus any Current Reports on Form 8-K necessary or required to be filed by applicable law, any Quarterly Reports on Form 10-Q or any Annual Reports on Form 10-K filed by the Company with the Commission, or any other information necessary so that (i) the Initial Shelf Registration Statement shall not include any untrue statement of material fact or omit to state any material fact necessary in order to make the statements therein not misleading, and (ii) the Company complies with its obligations under Item 512(a)(1) of Regulation S-K.

3.     Subsequent Shelf Registration Statements  For so long as any Registrable Securities remain outstanding, the Company shall (i) use its best efforts to become eligible and

#4826-8994-0026

maintain such eligibility to register the Registrable Securities on Form S-3 and meet the requirements of General Instruction VII of Form S-1 after the Initial Shelf Expiration Date, (ii) use its best efforts to cause any S-3 Shelf Registration Statement to be declared effective by the Commission and (iii) use its best efforts to keep such S-3 Shelf Registration Statement continuously effective until all Registrable Securities covered by the S-3 Shelf Registration Statement have been sold.

4.    Demand Registration

(a)    At any time and from time to time on or following the Plan Effective Date, any Holder or group of Holders may request in writing ("*Demand Registration Request*") that the Company effect the registration of all or part of such Holder's or Holders' Registrable Securities with the Commission under and in accordance with the provisions of the Securities Act.  The Company will file a Registration Statement covering such Holder's or Holders' Registrable Securities requested to be registered, and shall use its reasonable best efforts to cause such Registration Statement to be declared effective, as promptly as practicable after receipt of such request; *provided, however,* that the Company will not be required to file a Registration Statement pursuant to this Section 4:

(A)    if the number of Registrable Securities requested to be registered on such Registration Statement is less than twenty percent (20%) of the Initial Registrable Securities Number;

(B)    if the Registrable Securities requested to be registered are already covered by an existing and effective Registration Statement and such Registration Statement may be utilized for the offer and sale of the Registrable Securities requested to be registered;

(C)    if a Registration Statement filed by the Company pursuant to this Agreement shall have previously been initially declared effective by the Commission within the one hundred twenty (120) days preceding the date of such Demand Registration Request is made; and

(D)    if the number of Demand Registration Requests previously made pursuant to this Section 4(a) shall equal or exceed five (5); *provided, however* that a Demand Registration Request shall not be considered made for purposes of this clause (D) unless the requested Registration Statement has been declared effective by the Commission.

(b)    A Demand Registration Request shall specify (i) the then-current name and address of such Holder or Holders, (ii) the aggregate number of Registrable Securities requested to be registered, (iii) the total number of Registrable Securities then beneficially owned by such Holder or Holders, and (iv) the intended means of distribution.  If at the time the Demand Registration Request is made the Company appears, based on public information available to such Holder or Holders, eligible to use Form S-3 for the offer and sale of the Registrable Securities, the Holder or Holders making such request may request that the registration be in the form of a Shelf Registration Statement (for the avoidance of doubt, the Company shall not be under the obligation to file a Shelf Registration Statement on Form S-3 if, upon the advice of its counsel, it is not eligible to make such a filing).

7

(c)    The Company may satisfy its obligations under Section 4(a) hereof by amending (to the extent permitted by applicable law) any Registration Statement previously filed by the Company under the Securities Act, so that such amended Registration Statement will permit the disposition (in accordance with the intended methods of disposition specified pursuant to Section 4(b)(iv)) of all of the Registrable Securities for which a Demand Registration Request has been properly made under Section 4(b). If the Company so amends a previously filed Registration Statement, the Company will be deemed to have effected a registration for purposes of Section 4(a); *provided, however*, that the Effective Date of the amended Registration Statement, as amended pursuant to this Section 4(c) shall be the "the first day of effectiveness" of such Registration Statement for purposes of determining the period during which the Registration Statement is required to be maintained effective in accordance with Section 4(e).

(d)    Within ten (10) days after receiving a Demand Registration Request, the Company shall give written notice of such request to all other Holders of Registrable Securities and shall, subject to the provisions of Section 5(d) in the case of an Underwritten Offering, include in such registration all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within fifteen (15) days after the Company's giving of such notice, *provided*, that such Registrable Securities are not already covered by an existing and effective Registration Statement that may be utilized for the offer and sale of the Registrable Securities requested to be registered in the manner so requested.

(e)    The Company will use its reasonable best efforts to keep a Registration Statement that has become effective as contemplated by this Section 4 continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission:

(A)    in the case of a Registration Statement other than a Shelf Registration Statement, until all Registrable Securities registered thereunder have been sold pursuant to such Registration Statement, but in no event later than two hundred seventy (270) days from the Effective Date of such Registration Statement; and

(B)    in the case of a Shelf Registration Statement, until the earlier of: (x) three (3) years following the Effective Date of such Shelf Registration Statement; and (y) the date that all Registrable Securities covered by such Shelf Registration Statement shall cease to be Registrable Securities;

*provided, however,* that in the event of any stop order, injunction or other similar order or requirement of the Commission relating to any Shelf Registration Statement, if any Registrable Securities covered by such Shelf Registration Statement remain unsold, the period during which such Shelf Registration Statement shall be required to remain effective will be extended by the number of days during which such stop order, injunction or similar order or requirement is in effect; *provided further, however*, that if any Shelf Registration Statement was initially declared effective on Form S-3 and, prior to the date determined pursuant to Section 4(e)(B), the Company becomes ineligible to use Form S-3, the period during which such Shelf Registration Statement shall be required to remain effective will be extended by the number of days during which the Company did not have an effective Registration Statement covering unsold Registrable Securities initially registered on such Shelf Registration Statement.

8

(f)      The Holder or Holders making a Demand Registration Request may, at any time prior to the Effective Date of the Registration Statement relating to such Demand Registration Request, revoke such Demand Registration Request for all or part of such Holder's or Holders' Registrable Securities by providing a written notice to the Company. If, pursuant to the preceding sentence, the entire Demand Registration Request is revoked, then, at the option of the Holder or Holders who revoke such Demand Registration Request, either (i) such Holder or Holders shall reimburse the Company for all of its reasonable and documented out-of-pocket expenses incurred in the preparation, filing and processing of the Registration Statement, which out-of-pocket expenses, for the avoidance of doubt, shall not include overhead expenses and which requested registration shall not count as one of the permitted Demand Registration Requests hereunder or (ii) the requested registration that has been revoked will be deemed to have been effected for purposes of Section 4(a).

5.      Underwritten Offerings.  The following procedures shall govern Underwritten Offerings consummated pursuant to this Agreement, whether in the case of an Underwritten Takedown or otherwise.

(a)      Upon the demand of one or more Holders holding, collectively at least twenty percent (20%) of the Initial Registrable Securities Number, the Company shall facilitate a "takedown" of Registrable Securities registered on any Registration Statement filed pursuant to this Agreement in the form of an Underwritten Offering (each, an "*Underwritten Takedown*"), in the manner and subject to the conditions described in this Section 5.

(b)      (i) The Majority Holders shall select one or more investment banking firm(s) of national standing to be the managing underwriter or underwriters for any Underwritten Offering pursuant to a Demand Registration Request or an Underwritten Takedown, in each case with the consent of the Company, which consent shall not be unreasonably withheld, conditioned or delayed and (ii) the Company shall select one or more investment banking firm(s) of national standing to be the managing underwriter or underwriters for any Piggyback Offering with the consent of the Majority Holders, which consent shall not be unreasonably withheld, conditioned or delayed.

(c)      All Holders proposing to distribute their securities through an Underwritten Offering, as a condition for inclusion of their Registrable Securities therein, shall agree to enter into an underwriting agreement with the underwriters; *provided, however* that the underwriting agreement is in customary form and reasonably acceptable to the Majority Holders and *provided, further, however* that no Holder of Registrable Securities included in any Underwritten Offering shall be required to make any representations or warranties to the Company or the underwriters (other than representations and warranties regarding (i) such Holder's ownership of its Registrable Securities to be sold or transferred by such Holder, (ii) such Holder's power and authority to effect the transfer of its Registrable Securities and (iii) such matters pertaining to compliance with securities laws as may be reasonably requested).

(d)      If the managing underwriter or underwriters for an Underwritten Offering pursuant to a Demand Registration or an Underwritten Takedown advises the Holders that the total amount of Registrable Securities or other shares of Common Stock permitted to be registered is such as to materially adversely affect the success of such Underwritten Offering, the

9

number of Registrable Securities or other shares of Common Stock to be registered on such Registration Statement will be reduced as follows: *first*, the Company shall reduce or eliminate the securities of the Company to be included by any Person other than a Holder or the Company; *second*, the Company shall reduce or eliminate any securities of the Company to be included by the Company; and *third*, the Company shall reduce the number of Registrable Securities to be included by Holders on a *pro rata* basis based on the total number of Registrable Securities requested by the Holders to be included in the Underwritten Offering.

(e) Within ten (10) days after receiving a request for an Underwritten Offering constituting a "takedown" from a Shelf Registration Statement, the Company shall give written notice of such request to all other Holders, and subject to the provisions of Section 5(d) hereof, include in such Underwritten Offering all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within fifteen (15) days after the Company's giving of such notice; *provided, however* that such Registrable Securities are covered by an existing and effective Shelf Registration Statement that may be utilized for the offering and sale of the Registrable Securities requested to be registered.

(f) The Company will pay any underwriting fees and discounts in connection with any Underwritten Offering.

(g) If the managing underwriter or underwriters for an Underwritten Takedown (or the Holders selling shares of Common Stock in such Underwritten Takedown on behalf of such managing underwriter or underwriters) advises the Company, in writing, that there is an insufficient number of shares of Common Stock (the "*Shortfall Number*") being offered for sale to successfully consummate such Underwritten Takedown and/or create sufficient liquidity for optimal trading of the Class A Shares based on market conditions (including the expected average daily trading volume and the spread between the bid and ask prices of the Class A Shares), the financial condition of the Corporation and such other factors that the managing underwriter or underwriters may consider based on their experience in their sole discretion, one or more Holders holding, collectively, at least twenty percent (20%) of the Company's total number of issued and outstanding Class B Shares may instruct the Company to issue, for sale in such Underwritten Takedown, a number of Class A Shares equal to the Shortfall Number and use the proceeds of such sales to redeem (a "Redemption") a number of Class B Shares equal to the Shortfall Number in accordance with Article IV, Section 2(f) of the Company's Certificate of Incorporation at a purchase price per share equal to the public offering price per share paid by the underwriters for the shares of Common Stock in the Underwritten Takedown net any underwriting fees or discounts payable on such shares of Common Stock actually paid by any other selling Holders. The rights and obligations contained in this Section 5(g) shall become terminated and cease to have any force and effect on the earliest to occur of (i) December 15, 2018, (ii) a Redemption and (iii) the date that the Class A Shares are listed on a nationally recognized securities exchange in connection with an Underwritten Takedown or an initial public offering pursuant to an effective registration statement under the Securities Act.

(h) The Company will not be required to undertake an Underwritten Offering pursuant to Section 5(a) if the number of Underwritten Offerings previously made pursuant to Section 5(a) in the immediately preceding twelve (12)-month period shall exceed [four (4)]; *provided* that an Underwritten Offering shall not be considered made for purposes of this

10

Section 5(h) unless the offering has resulted in the disposition by the Holders of at least sixty percent (60)% of the amount of Registrable Securities requested to be included.

      6.      Grace Periods.

(a)      Notwithstanding anything to the contrary herein:

(A)      the Company shall be entitled to postpone the filing or effectiveness of, or, at any time after a Registration Statement has been declared effective by the Commission suspend the use of, a Registration Statement (including the Prospectus included therein) if in the good faith judgment of the Board, such registration, offering or use would reasonably be expected to materially affect in an adverse manner or materially interfere with any *bona fide* material financing of the Company or any material transaction under consideration by the Company or would require the disclosure of information that has not been, and is not otherwise required to be, disclosed to the public and the premature disclosure of which would materially affect the Company in an adverse manner; *provided however*, that in the event such Registration Statement relates to a Demand Registration Request or an Underwritten Offering pursuant to Section 5(a), then the Holders initiating such Demand Registration Request or such Underwritten Offering shall be entitled to withdraw the Demand Registration Request or request for the Underwritten Offering and, if such request is withdrawn, it shall not count against the limits imposed pursuant to Section 4(a)(D) or Section 5(h) and the Company shall pay all registration expenses in connection with such registration; and

(B)      at any time after a Registration Statement has been declared effective by the Commission and there is no duty to disclose under applicable law, the Company may delay the disclosure of material non-public information concerning the Company if the disclosure of such information at the time would, in the good faith judgment of the Board, adversely affect the Company (the period of a postponement or suspension as described in Section 6(a)(A) and/or a delay described in this Section 6(a)(B), a "*Grace Period*").

(b)      The Company shall (i) promptly notify the Holders in writing of the existence of the event or material non-public information giving rise to a Grace Period (*provided*, that the Company shall not disclose the content of such material non-public information to any Holder, without the express consent of such Holder) or the need to file a post-effective amendment, as applicable, and the date on which such Grace Period will begin, (ii) use its reasonable best efforts to terminate a Grace Period as promptly as practicable and (iii) promptly notify the Holders in writing of the date on which the Grace Period ends.

(c)      The duration of any one Grace Period shall not exceed forty-five (45) days, and the aggregate of all Grace Periods in total during any three hundred sixty-five (365) day period shall not exceed sixty (60) days. For purposes of determining the length of a Grace Period, the Grace Period shall be deemed to begin on and include the date the Holders receive the notice referred to in Section 6(b)(i) and shall end on and include the later of the date the Holders receive the notice referred to in Section 6(b)(iii) and the date referred to in such notice. In the event the Company declares a Grace Period, the period during which the Company is required

#4826-8994-0026

to maintain the effectiveness of an Initial Shelf Registration Statement or a Registration Statement filed pursuant to a Demand Registration Request shall be extended by the number of days during which such Grace Period is in effect.

7.      Piggyback Registration

(a)      If at any time, and from time to time, the Company proposes to:

(A)      file a registration statement under the Securities Act with respect to an underwritten offering of any class of equity securities of the Company or any securities convertible or exercisable into any equity securities of the Company (other than with respect to a registration statement (i) on Form S-8 or any successor form thereto, (ii) on Form S-4 or any successor form thereto or (iii) another form not available for registering the Registrable Securities for sale to the public), whether or not for its own account; or

(B)      conduct an underwritten offering constituting a "takedown" of a class of equity securities of the Company or any securities convertible or exercisable into any equity securities of the Company registered under a shelf registration statement previously filed by the Company;

the Company shall give written notice (the "*Piggyback Notice*") of such proposed filing or underwritten offering to the Holders at least twenty (20) Business Days before the anticipated filing date.  Such notice shall include the number and class of securities proposed to be registered or offered, the proposed date of filing of such registration statement or the conduct of such underwritten offering, any proposed means of distribution of such securities, any proposed managing underwriter of such securities and a good faith estimate by the Company of the proposed maximum offering price of such securities as such price is proposed to appear on the front cover page of such registration statement (or, in the case of an Underwritten Offering, would appear on the front cover page of a registration statement), and shall offer the Holders the opportunity to register such amount of Registrable Securities as each Holder may request on the same terms and conditions as the registration of the Company's and/or the holders of other securities of the Company securities, as the case may be (a "*Piggyback Offering*"). Subject to Section 7(b), the Company will include in each Piggyback Offering all Registrable Securities for which the Company has received written requests for inclusion within fifteen (15) Business Days after the date the Piggyback Notice is given; *provided, however,* that in the case of the filing of a registration statement, such Registrable Securities are not otherwise registered pursuant to an existing and effective Shelf Registration Statement under this Agreement; *provided further, however* that, in the case of an underwritten offering in the form of a "takedown" under a shelf registration statement, such Registrable Securities are covered by an existing and effective Shelf Registration Statement that may be utilized for the offering and sale of the Registrable Securities requested to be offered.

(b)      The Company will cause the managing underwriter or underwriters of the proposed offering to permit the Holders that have requested Registrable Securities to be included in the Piggyback Offering to include all such Registrable Securities on the same terms and conditions as any similar securities, if any, of the Company.  Notwithstanding the foregoing, if the managing underwriter or underwriters of such underwritten offering advises

12

#4826-8994-0026

the Company and the selling Holders in writing that, in its view, the total amount of securities that the Company, such Holders and any other holders entitled to participate in such offering ("*Other Holders*") propose to include in such offering is such as to materially adversely affect the success of such underwritten offering, then:

> (A)    if such Piggyback Offering is an underwritten primary offering by the Company for its own account, the Company will include in such Piggyback Offering: (i) *first*, all securities to be offered by the Company; (ii) *second*, up to the full amount of securities requested to be included in such Piggyback Offering by the Holders; and (iii) *third*, up to the full amount of securities requested to be included in such Piggyback Offering by all Other Holders;

> (B)    if such Piggyback Offering is an underwritten secondary offering for the account of Other Holders exercising "demand" rights (including pursuant to a Demand Registration Request), the Company will include in such registration: (i) *first*, all securities of the Other Holders exercising "demand" rights (including pursuant to a Demand Registration Request) requested to be included therein; (ii) *second*, up to the full amount of securities proposed to be included in the registration by the Company; and (iii) *third*, up to the full amount of securities requested to be included in such Piggyback Offering by the Holders and any Other Holders entitled to participate therein, allocated *pro rata* among such Holders and Other Holders on the basis of the amount of securities requested to be included therein by each such Holder or Other Holder;

such that, in each case, the total amount of securities to be included in such Piggyback Offering is the full amount that, in the view of such managing underwriter, can be sold without materially adversely affecting the success of such Piggyback Offering.

(c)    If at any time after giving the Piggyback Notice and prior to the time sales of securities are confirmed pursuant to the Piggyback Offering, the Company determines for any reason not to register or delay the registration of the Piggyback Offering, the Company may, at its election, give notice of its determination to all Holders, and in the case of such a determination, will be relieved of its obligation to register any Registrable Securities in connection with the abandoned or delayed Piggyback Offering, without prejudice.

(d)    Any Holder of Registrable Securities requesting to be included in a Piggyback Offering may withdraw its request for inclusion by giving written notice to the Company, at least three (3) Business Days prior to the anticipated Effective Date of the Registration Statement filed in connection with such Piggyback Offering, or in the case of a Piggyback Offering constituting a "takedown" off of a shelf registration statement, at least three (3) Business Days prior to the anticipated date of the filing by the Company under Rule 424 of a prospectus supplement (which shall be the preliminary prospectus supplement, if one is used in the "takedown") with respect to such offering, of its intention to withdraw from that registration; *provided*, *however*, that (i) the Holder's request be made in writing and (ii) the withdrawal will be irrevocable and, after making the withdrawal, a Holder will no longer have any right to include its Registrable Securities in that Piggyback Offering.

13

8.     Registration Procedures. If and when the Company is required to effect any registration under the Securities Act as provided in Sections 2(a), 4(a), 5 or 7 of this Agreement, the Company shall use its reasonable best efforts to:

(a)     prepare and file with the Commission the requisite Registration Statement to effect such registration and thereafter use its reasonable best efforts to cause such Registration Statement to become and remain effective, subject to the limitations contained herein;

(b)     prepare and file with the Commission such amendments and supplements to such Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement effective and to comply with the provisions of the Securities Act and the Exchange Act with respect to the disposition of all Registrable Securities covered by such Registration Statement until such time as all of such Registrable Securities have been disposed of in accordance with the method of disposition set forth in such Registration Statement, subject to the limitations contained herein;

(c)     (i) before filing a Registration Statement or Prospectus or any amendments or supplements thereto, at the Company's expense, furnish to the Holders whose securities are covered by the Registration Statement copies of all such documents, other than documents that are incorporated by reference into such Registration Statement or Prospectus, proposed to be filed and such other documents reasonably requested by such Holders (which may be furnished by email),  and afford Counsel to the Holders a reasonable opportunity to review and comment on such documents; and (ii) in connection with the preparation and filing of each such Registration Statement pursuant to this Agreement, (A) upon reasonable advance notice to the Company, give each of the foregoing such reasonable access to all financial and other records, corporate documents and properties of the Company as shall be necessary, in the reasonable opinion of Counsel to the Holders and such underwriters, to conduct a reasonable due diligence investigation for purposes of the Securities Act and Exchange Act, and (B) upon reasonable advance notice to the Company and during normal business hours, provide such reasonable opportunities to discuss the business of the Company with its officers, directors, employees and the independent public accountants who have certified its financial statements as shall be necessary, in the reasonable opinion of Counsel to the Holders and such underwriters, to conduct a reasonable due diligence investigation for purposes of the Securities Act and the Exchange Act;

(d)     notify each selling Holder of Registrable Securities, promptly after the Company receives notice thereof, of the time when such Registration Statement has been declared effective or a supplement to any Prospectus forming a part of such Registration Statement has been filed;

(e)     with respect to any offering of Registrable Securities, furnish to each selling Holder of Registrable Securities, and the managing underwriters for such Underwritten Offering, if any, without charge, such number of copies of the applicable Registration Statement, each amendment and supplement thereto, the Prospectus included

14

in such Registration Statement (including each preliminary Prospectus, final Prospectus, and any other Prospectus (including any Prospectus filed under Rule 424, Rule 430A or Rule 430B promulgated under the Securities Act and any "issuer free writing prospectus" as such term is defined under Rule 433 promulgated under the Securities Act), all exhibits and other documents filed therewith and such other documents as such seller or such managing underwriters may reasonably request including in order to facilitate the disposition of the Registrable Securities owned by such seller, and upon request, a copy of any and all transmittal letters or other correspondence to or received from, the Commission or any other governmental authority relating to such offer;

(f)    (i) register or qualify all Registrable Securities covered by such Registration Statement under such other securities or blue sky laws of such states or other jurisdictions of the United States of America as the Holders covered by such Registration Statement shall reasonably request in writing, (ii) keep such registration or qualification in effect for so long as such Registration Statement remains in effect and (iii) take any other action that may be necessary or reasonably advisable to enable such Holders to consummate the disposition in such jurisdictions of the securities to be sold by such Holders, except that the Company shall not for any such purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not but for the requirements of this Section 8(f) be obligated to be so qualified, to subject itself to taxation in such jurisdiction or to consent to general service of process in any such jurisdiction;

(g)    cause all Registrable Securities included in such Registration Statement to be registered with or approved by such other federal or state governmental agencies or authorities as necessary upon the opinion of counsel to the Company or Counsel to the Holders of Registrable Securities included in such Registration Statement to enable such Holder or Holders thereof to consummate the disposition of such Registrable Securities in accordance with their intended method of distribution thereof;

(h)    with respect to any Underwritten Offering, obtain and, if obtained, furnish to each Holder that is named as an underwriter in such Underwritten Offering and each other underwriter thereof, a signed:

(A)    opinion of outside counsel for the Company (including a customary 10b-5 statement), dated the date of the closing under the underwriting agreement and addressed to the underwriters, reasonably satisfactory (based on the customary form and substance of opinions of issuers' counsel customarily given in such an offering) in form and substance to such underwriters, if any, and

(B)    "comfort" letter, dated the date of the Underwriting Agreement and another dated the date of the closing under the underwriting agreement and addressed to the underwriters and signed by the independent public accountants who have certified the Company's financial statements included or incorporated by reference in such registration statement, reasonably satisfactory (based on the customary form and substance of "cold comfort" letters of issuers' independent

public accountant customarily given in such an offering) in form and substance to such Holder and such underwriters, if any,

in each case, covering substantially the same matters with respect to such Registration Statement (and the Prospectus included therein) and, in the case of the accountants' comfort letter, with respect to events subsequent to the date of such financial statements, as are customarily covered in opinions of issuer's counsel and in accountants' comfort letters delivered to underwriters in such types of offerings of securities;

(i)     notify each Holder of Registrable Securities included in such Registration Statement at any time when a Prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made and for which the Company chooses to suspend the use of the Registration Statement and Prospectus in accordance with the terms of this Agreement, at the written request of any such Holder, promptly prepare and furnish to it a reasonable number of copies of a supplement to or an amendment of such Prospectus as may be necessary so that, as thereafter delivered to the purchasers of such securities, such Prospectus, as supplemented or amended, shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made;

(j)     notify the Holders of Registrable Securities included in such Registration Statement promptly of any request by the Commission for the amending or supplementing of such Registration Statement or Prospectus or for additional information;

(k)     advise the Holders of Registrable Securities included in such Registration Statement promptly after the Company receives notice or obtains knowledge of any order suspending the effectiveness of a registration statement relating to the Registrable Securities at the earliest practicable moment and promptly use its reasonable best efforts to obtain the withdrawal;

(l)     otherwise comply with all applicable rules and regulations of the Commission and any other governmental agency or authority having jurisdiction over the offering of Registrable Securities, and make available to its stockholders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve (12) months, but not more than eighteen (18) months, beginning with the first (1st) full calendar month after the Effective Date of such Registration Statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 promulgated thereunder and which requirement will be deemed satisfied if the Company timely files complete and accurate information on Form 10-Q and 10-K and Current Reports on Form 8-K under the Exchange Act and otherwise complies with Rule 158 under the Securities Act;

16

#4826-8994-0026

(m)     (i) cause all Registrable Securities included in a Registration Statement to be listed on the national securities exchange(s) on which similar securities issued by the Company are then listed (if any) or any successor national securities exchange(s), if the listing of such Registrable Securities is then permitted under the rules of such exchange(s) and use its reasonable best efforts to maintain such listing until each Holder has sold all of its Registrable Securities, or (ii) if (x) the Company is not required pursuant to Section 8(m)(i) to list Registrable Securities on a specific national securities exchange and (y) one or more Holders holding at least twenty percent (20%) of the Initial Registrable Securities requests that the Company list such Registrable Securities on a national securities exchange in connection with an Underwritten Offering, use its reasonable best efforts to list the Registrable Securities on a national securities exchange designated by such requesting Holders;

(n)     provide and cause to be maintained a transfer agent and registrar for the Registrable Securities included in a Registration Statement no later than the Effective Date thereof;

(o)     enter into such agreements (including an underwriting agreement in customary form) and take such other actions as the Holders beneficially owning a majority of the Registrable Securities included in a Registration Statement or the underwriters, if any, shall reasonably request in order to expedite or facilitate the disposition of such Registrable Securities, including customary indemnification; and provide reasonable cooperation, including causing its Chief Executive Officer and its Chief Financial Officer and/or Chief Accounting Officer to attend and participate in "road shows" and other information meetings organized by the underwriters, if any, as reasonably requested; *provided, however,* that the Company shall have no obligation to participate in more than two (2) "road shows" in any twelve (12)-month period and such participation shall not unreasonably interfere with the business operations of the Company;

(p)     if requested by the managing underwriter(s) or the Holders beneficially owning a majority of the Registrable Securities being sold in connection with an Underwritten Offering, promptly incorporate in a prospectus supplement or post-effective amendment such information relating to the plan of distribution for such Registrable Securities provided to the Company in writing by the managing underwriters and the Holders of a majority of the Registrable Securities being sold and that is required to be included therein relating to the plan of distribution with respect to such Registrable Securities, including without limitation, information with respect to the number of Registrable Securities being sold to such underwriters, the purchase price being paid therefor by such underwriters and with respect to any other terms of the Underwritten Offering of the Registrable Securities to be sold in such offering, and make any required filings with respect to such information relating to the plan of distribution as soon as practicable after notified of the information;

(q)     cooperate with the Holders of Registrable Securities included in a Registration Statement and the managing underwriter(s), if any, to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be sold and

17

not bearing any restrictive legends, and enable such Registrable Securities to be in such amounts and registered in such names as the managing underwriters, or, if none, the Holders beneficially owning a majority of the Registrable Securities being offered for sale, may reasonably request at least three (3) Business Days prior to any sale of Registrable Securities to the underwriters; and

(r)      otherwise use its reasonable best efforts to take all other steps necessary to effect the registration of such Registrable Securities contemplated hereby.

In addition, at least ten (10) Business Days prior to the first anticipated filing date of a Registration Statement for any registration under this Agreement, the Company will notify each Holder of the information the Company requires from that Holder, including any update to or confirmation of the information contained in the Selling Stockholder Questionnaire, if any, which shall be completed and delivered to the Company promptly upon request and, in any event, within five (5) Business Days prior to the applicable anticipated filing date. Each Holder further agrees that it shall not be entitled to be named as a selling securityholder in the Registration Statement or use the Prospectus for offers and resales of Registrable Securities at any time, unless such Holder has returned to the Company a completed and signed Selling Stockholder Questionnaire and a response to any requests for further information as described in the previous sentence and, if an Underwritten Offering, entered into an underwriting agreement with the underwriters in accordance with Section 5(c). If a Holder of Registrable Securities returns a Selling Stockholder Questionnaire or a request for further information, in either case, after its respective deadline, the Company shall be permitted to exclude such Holder from being a selling security holder in the Registration Statement or any pre-effective or post-effective amendment thereto. Each Holder acknowledges and agrees that the information in the Selling Stockholder Questionnaire or request for further information as described in this Section 8 will be used by the Company in the preparation of the Registration Statement and hereby consents to the inclusion of such information in the Registration Statement.

9.      Other Covenants.   The Company covenants and agrees with each Holder of Registrable Securities that:

(a)      The Company shall not amend its the certificate of incorporation, bylaws or similar organizational documents in any manner that has an adverse effect on the rights of Holders contained in Section 5(g), unless the Company first obtains the consent, in writing, from Holders holding at least a majority of the then outstanding Registrable Securities.

(b)      Until and unless (x) the Common Stock is listed on a "national securities exchange" as defined in Rule 600(b)(45) of Regulation National Market System promulgated by the Commission, as amended or (y) the Common Stock may be sold by any and all Holders without restriction by the Commission pursuant to a Registration Statement in an at-the-market offering, the Company shall use its reasonable best efforts to cause (i) the Common Stock to be quoted on the OTCBB market as promptly as practicable after the Plan Effective Date and shall thereafter use its reasonable best efforts to maintain such quotation and (ii) at any time during which the Company is eligible to have the Common Stock quoted on the OTCQB market and/or the OTCQX market, the

18

#4826-8994-0026

Company shall use its reasonable best efforts to cause the Common Stock to be quoted on the OTCQB market or the OTCQX market in lieu of the OTCBB Market as promptly as practicable, *provided,* that at any time the Company is no longer eligible to have the Common Stock quoted on the OTCQB market or the OTCQX market, the Company will comply with its obligations under Section 9(b)(i).

10.    Registration Expenses. All fees and expenses incident to the Company's performance of or compliance with its obligations under this Agreement shall be borne by the Company whether or not any Registrable Securities are sold pursuant to a Registration Statement. The fees and expenses referred to in the foregoing sentence shall include, without limitation, (i) all registration and filing fees (including, without limitation, fees and expenses (A) with respect to filings required to be made with any stock exchange on which Class A Shares or Class B Shares are then listed for trading, (B) with respect to compliance with applicable state securities or Blue Sky laws (including, without limitation, fees and disbursements of counsel for the Company in connection with Blue Sky qualifications or exemptions of the Registrable Securities and determination of the eligibility of the Registrable Securities for investment under the laws of such jurisdictions as requested by the Holders) and (C) if not previously paid by the Company in connection with an Issuer Filing, with respect to any filing that may be required to be made by any broker through which a Holder intends to make sales of Registrable Securities with the Financial Industry Regulatory Authority ("*FINRA*") pursuant to the FINRA Rule 5110, so long as the broker is receiving no more than a customary brokerage commission in connection with such sale, (ii) printing expenses (including, without limitation, expenses of printing certificates for Registrable Securities and of printing prospectuses if the printing of prospectuses is reasonably requested by the Holders of a majority of the Registrable Securities included in the Registration Statement), (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel for the Company, (v) the reasonable fees and expenses incurred in connection with any "road show" for Underwritten Offerings, (vi) Securities Act liability insurance, if the Company so desires such insurance, and (vii) fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement.  In addition, the Company will pay the reasonable fees and disbursements of one legal counsel to the Holders as well as any local counsel to the Holders (each such counsel to be selected by a majority of the Holders of Registrable Securities) retained in connection with any Demand Registration or Underwritten Offering, including, for the avoidance of doubt, any expenses of one legal counsel to the Holders in connection with the filing or amendment of any Registration Statement, Prospectus or free writing prospectus hereunder.

11.    Lockups.

(a)    In connection with any Underwritten Takedown or underwritten registration pursuant to a Demand Registration Request or other underwritten public offering of equity securities by the Company, except with the written consent of the underwriters managing such offering, no Holder (irrespective of whether such Holder participates in such Underwritten Takedown, Piggyback Offering or underwritten registration) who beneficially owns two percent (2%) or more of the outstanding shares of Common Stock at such time shall effect any public sale or distribution (including sales pursuant to Rule 144) of equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities,

19

without prior written consent from the Company, during the seventy-five (75)-day period beginning on the date a prospectus or prospectus supplement with respect to the pricing of such offering is filed with the Commission (or such lesser period as may be required to complete the offering) (the "*Lockup Period*"), except as part of such offering, *provided*, that such Lockup Period restrictions are applicable on substantially similar terms to the Company and all of its and its subsidiaries' executive officers and directors; *provided*, *further*, that nothing herein shall prevent any Holder from making a distribution of Registrable Securities to any of its partners, members or stockholders thereof or a transfer of Registrable Securities to an Affiliate or Related Fund that is otherwise in compliance with the applicable securities laws, so long as such distributees or transferees, as applicable, agree to be bound by the restrictions set forth in this Section 11(a). Each Holder agrees to execute a lock-up agreement in favor of the Company's underwriters to such effect and, in any event, that the Company's underwriters in any relevant offering shall be third party beneficiaries of this Section 11(a). The provisions of this Section 11(a) will no longer apply to a Holder once such Holder ceases to hold Registrable Securities.

(b) In connection with any Underwritten Offering, the Company shall not effect any public sale or distribution of equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, without prior written consent from the Majority Holders, during the Lockup Period, except as part of such offering, *provided*, that such Lockup Period restrictions are applicable on substantially similar terms to the Majority Holders. The Company agrees to execute a lock-up agreement in favor of the Majority Holders' underwriters to such effect and, in any event, that the Majority Holders' underwriters in any relevant offering shall be third party beneficiaries of this Section 11(b). Notwithstanding the foregoing, the Company may effect a public sale or distribution of securities of the type described above and during the periods described above if such sale or distribution is made pursuant to registrations on Form S-4 or Form S-8 or as part of any registration of securities or offering and sale to employees, directors or consultants of the company and its subsidiaries pursuant to any employee stock plan or other employee benefit plan arrangement.

12. Indemnification.

(a) Indemnification by the Company. The Company shall, notwithstanding any termination of this Agreement, indemnify, defend and hold harmless each Holder, the officers, directors, agents, partners, members, managers, stockholders, Affiliates, employees and investment managers of each of them, each Person who controls any such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, partners, members, managers, investment managers, stockholders, agents and employees of each such controlling Person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, reasonable costs of preparation and investigation and reasonable attorneys' fees) and expenses (collectively, "*Losses*"), to which any of them may become subject, that arise out of or are based upon (i) any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus or (ii) any omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein (in

20

the case of any Prospectus or form of prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading, except to the extent, but only to the extent, that (A) such untrue statements, alleged untrue statements, omissions or alleged omissions are based solely upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, or to the extent that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was provided by such Holder expressly for use in the Registration Statement, such Prospectus or such form of Prospectus or in any amendment or supplement thereto, or (B) in the case of an occurrence of an event of the type specified in Section 8(i), related to the use by a Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of the Advice contemplated and defined in Section 16(c) below, but only if and to the extent that following the receipt of the Advice the misstatement or omission giving rise to such Loss would have been corrected. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an Indemnified Party (as defined in Section 12(c)), shall survive the transfer of the Registrable Securities by the Holders, and shall be in addition to any liability which the Company may otherwise have.

(b) Indemnification by Holders. Each Holder shall, severally and not jointly, indemnify and hold harmless the Company, its respective directors, officers, agents and employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, agents or employees of such controlling Persons, to the fullest extent permitted by applicable law, from and against all Losses, as incurred, arising out of or are based solely upon any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus, or any form of prospectus, or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus, or any form of prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading (i) to the extent, but only to the extent, that such untrue statements or omissions are based solely upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein or (ii) to the extent, but only to the extent, that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was provided by such Holder expressly for use in a Registration Statement, such Prospectus or such form of Prospectus or in any amendment or supplement thereto or (iii) in the case of an occurrence of an event of the type specified in Section 8(i), to the extent, but only to the extent, related to the use by such Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of the Advice contemplated in Section 16(c), but only if and to the extent that following the receipt of the Advice the misstatement or omission giving rise to such Loss would have been corrected. In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation.  Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an Indemnified Party (as defined in Section 12(c)), shall survive the transfer of the Registrable Securities by the Holders, and shall be in addition to any liability which the Holder may otherwise have.

21

(c)     Conduct of Indemnification Proceedings. If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "*Indemnified Party*"), such Indemnified Party shall promptly notify the Person from whom indemnity is sought (the "*Indemnifying Party*") in writing, and the Indemnifying Party shall have the right to assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all reasonable fees and expenses incurred in connection with defense thereof; *provided*, that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that such failure shall have materially and adversely prejudiced the Indemnifying Party.

An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (1) the Indemnifying Party has agreed in writing to pay such fees and expenses; (2) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding; or (3) the named parties to any such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel that in the reasonable judgment of such counsel a conflict of interest exists if the same counsel were to represent such Indemnified Party and the Indemnifying Party; *provided*, that the Indemnifying Party shall not be liable for the reasonable and documented fees and expenses of more than one separate firm of attorneys at any time for all Indemnified Parties. The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its written consent, which consent shall not be unreasonably withheld, delayed or conditioned. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding.

Subject to the terms of this Agreement, all reasonable and documented fees and expenses of the Indemnified Party (including reasonable and documented fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section 12(c)) shall be paid to the Indemnified Party, as incurred, with reasonable promptness after receipt of written notice thereof to the Indemnifying Party; *provided*, that the Indemnified Party shall promptly reimburse the Indemnifying Party for that portion of such fees and expenses applicable to such actions for which such Indemnified Party is finally judicially determined to not be entitled to indemnification hereunder. The failure to deliver written notice to the Indemnifying Party within a reasonable time of the commencement of any such action shall not relieve such Indemnifying Party of any liability to the Indemnified Party under this Section 112, except to the extent that the Indemnifying Party is materially and adversely prejudiced in its ability to defend such action.

(d)     Contribution. If a claim for indemnification under Section 12(a) or (b) is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless for any Losses, then each Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such

22

Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 12(d) were determined by *pro rata* allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this Section 12(d), no Holder shall be required to contribute, in the aggregate, any amount in excess of the amount by which the net proceeds actually received by such Holder from the sale of the Registrable Securities subject to the Proceeding exceeds the amount of any damages that such Holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

13.    Rule 144 and Rule 144A; Other Exemptions.  With a view to making available to the Holders of Registrable Securities the benefits of Rule 144 and Rule 144A promulgated under the Securities Act and other rules and regulations of the Commission that may at any time permit a Holder of Registrable Securities to sell securities of the Company without registration, until such time as when no Registrable Securities remain outstanding, the Company covenants that it will (i) file in a timely manner all reports and other documents required, if any, to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted thereunder and (ii) make available information necessary to comply with Rule 144 and Rule 144A, if available with respect to resales of the Registrable Securities under the Securities Act, at all times, all to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by (x) Rule 144 and Rule 144A promulgated under the Securities Act (if available with respect to resales of the Registrable Securities), as such rules may be amended from time to time or (y) any other rules or regulations now existing or hereafter adopted by the Commission.  Upon the reasonable request of any Holder of Registrable Securities, the Company will deliver to such Holder a written statement as to whether it has complied with such information requirements, and, if not, the specific reasons for non-compliance.

14.    Transfer of Registration Rights.  Any Holder may freely assign its rights hereunder on a *pro rata* basis in connection with any sale, transfer, assignment, or other conveyance (any of the foregoing, a "*Transfer*") of Registrable Securities to any transferee or assignee; *provided* that all of the following additional conditions are satisfied: (a) the Company is given written notice by such Holder of such Transfer, stating the name and address of the transferee or assignee and identifying the Registrable Securities with respect to which such rights are being transferred or assigned; (b) such transferee or assignee assumes in writing

23

responsibility for its portion of the obligations of such original Holder under this Agreement; and (c) the transferor or assignor is not relieved of any obligations or liabilities under this Agreement arising out of events occurring prior to such Transfer; and *provided*, *further*, that (i) any rights assigned hereunder shall apply only in respect of the Registrable Securities that are Transferred and not in respect of any other securities that the transferee or assignee may hold and (ii) any Registrable Securities that are Transferred may cease to constitute Registrable Securities following such Transfer in accordance with the terms of this Agreement.

15.     <u>Further Assurances</u>.  Each of the parties hereto shall execute all such further instruments and documents and take all such further action as any other party hereto may reasonably require in order to effectuate the terms and purposes of this Agreement.  Holders will fully cooperate with the Company in connection with the Company's obligations under this Agreement, including by providing any such information reasonably requested by the Company in connection therewith.

16.     <u>Miscellaneous</u>.

(a)     <u>Remedies</u>. Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or other security) for specific performance and for other injunctive relief in order to enforce or prevent violation of the provisions of this Agreement.

(b)     <u>Compliance</u>. Each Holder covenants and agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it (unless an exemption therefrom is available) in connection with sales of Registrable Securities pursuant to any Registration Statement and shall sell the Registrable Securities only in accordance with a method of distribution described in each Registration Statement

(c)     <u>Discontinued Disposition</u>. By its acquisition of Registrable Securities, each Holder agrees that, upon receipt of a notice from the Company of the occurrence of a Grace Period or any event of the kind described in <u>Section 8(i)</u>, such Holder will forthwith discontinue disposition of such Registrable Securities under a Registration Statement until it is advised in writing (the "*Advice*") by the Company that the use of the applicable Prospectus (as it may have been supplemented or amended) may be resumed. The Company may provide appropriate stop orders to enforce the provisions of this paragraph.

(d)     <u>Preservation of Rights</u>.  The Company shall not grant any registration rights to third parties which are more favorable than or inconsistent with the rights granted hereunder unless any such more favorable rights are concurrently added to the rights granted hereunder.

(e)     <u>No Inconsistent Agreements</u>. The Company shall not hereafter enter into any agreement with respect to its securities which is inconsistent with or violates the rights granted to the Holders in this Agreement.

24

(f)        Amendments and Waivers. The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, or waived unless the same shall be in writing and signed by the Company and Holders holding at least a majority of the then outstanding Registrable Securities; *provided, however,* that any party may give a waiver as to itself; *provided further, however* that no amendment, modification, supplement, or waiver that disproportionately and adversely affects, alters, or changes the interests of any Holder shall be effective against such Holder without the prior written consent of such Holder; and *provided further* that the waiver of any provision with respect to any Registration Statement or offering may be given by Holders holding at least a majority of the then outstanding Registrable Securities entitled to participate in such offering or, if such offering shall have been commenced, having elected to participate in such offering.  Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of certain Holders and that does not directly or indirectly affect the rights of other Holders may be given by Holders of a majority of the Registrable Securities to which such waiver or consent relates; *provided, however*, that the provisions of this sentence may not be amended, modified, or supplemented except in accordance with the provisions of the immediately preceding sentence.  No waiver of any terms or conditions of this Agreement shall operate as a waiver of any other breach of such terms and conditions or any other term or condition, nor shall any failure to enforce any provision hereof operate as a waiver of such provision or of any other provision hereof.  No written waiver hereunder, unless it by its own terms explicitly provides to the contrary, shall be construed to effect a continuing waiver of the provisions being waived and no such waiver in any instance shall constitute a waiver in any other instance or for any other purpose or impair the right of the party against whom such waiver is claimed in all other instances or for all other purposes to require full compliance with such provision.  The failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of such provision and shall not affect the right of such party thereafter to enforce each provision of this Agreement in accordance with its terms.

(g)        Notices. Any notice or other communication required or which may be given hereunder shall be in writing and shall be sent by certified or regular mail, by private national courier service (return receipt requested, postage prepaid), by personal delivery, by electronic mail or by facsimile transmission.  Such notice or communication shall be deemed given (i) if mailed, two days after the date of mailing, (ii) if sent by national courier service, one Business Day after being sent, (iii) if delivered personally, when so delivered, (iv) if sent by electronic mail, on the Business Day such electronic mail is transmitted, or (v) if sent by facsimile transmission, on the Business Day such facsimile is transmitted, in each case as follows:

(A)        If to the Company:

25

Chaparral Energy, Inc.
701 Cedar Lake Boulevard
Oklahoma City, Oklahoma 73114
Fax:            405 [478]-[8770][1]
Attention:    K. Earl Reynolds
E-mail:        earl.reynolds@chaparralenergy.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
Attn: Ryan J. Maierson
811 Main Street, Suite 3700
Houston, TX 77002
Tel: (713) 546-5400
Fax: (713) 546-5401
E-mail: Ryan.Maierson@lw.com

(B)    If to the Holders (or to any of them), at their addresses as they appear in the records of the Company or the records of the transfer agent or registrar, if any, for the Registrable Securities.

If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the State of New York or the jurisdiction in which the Company's principal office is located, the time period shall automatically be extended to the Business Day immediately following such Saturday, Sunday or legal holiday.

(h)    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns (including any trustee in bankruptcy).  In addition, and whether or not any express assignment shall have been made, the provisions of this Agreement which are for the benefit of the Holders of Registrable Securities (or any portion thereof) as such shall be for the benefit of and enforceable by any subsequent holder of any Registrable Securities (or of such portion thereof); provided, that such subsequent holder of Registrable Securities shall be required to execute a joinder to this Agreement in form and substance reasonably satisfactory to the Company agreeing to be bound by its terms.  No assignment or delegation of this Agreement by the Company, or any of the Company's rights, interests or obligations hereunder, shall be effective against any Holder without the prior written consent of such Holder.

(i)    Execution and Counterparts. This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same Agreement.

(j)    Delivery by Facsimile.  This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or

---

[1] Note to Chaparral: Confirm notice fax number.

#4826-8994-0026

contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other electronic means, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

(k)     Governing Law; Venue.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) to the extent such rules or provisions would cause the application of the laws of any jurisdiction other than the State of New York.  Each of the parties to this Agreement consents and agrees that any action to enforce this Agreement or any dispute, whether such dispute arises in law or equity, arising out of or relating to this Agreement shall be brought exclusively in the United States District Court for the Southern District of New York or any New York State Court sitting in New York City.  The parties hereto consent and agree to submit to the exclusive jurisdiction of such courts.  Each of the parties to this Agreement waives and agrees not to assert in any such dispute, to the fullest extent permitted by applicable law, any claim that (i) such party and such party's property is immune from any legal process issued by such courts or (ii) any litigation or other proceeding commenced in such courts is brought in an inconvenient forum.  The parties hereby agree that mailing of process or other papers in connection with any such action or proceeding to an address provided in writing by the recipient of such mailing, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof and hereby waive any objections to service in the manner herein provided.

(l)     Waiver of Jury Trial.  Each of the parties to this Agreement hereby agrees to waive its respective rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Agreement, including contract claims, tort claims and all other common law and statutory claims.  Each party hereto acknowledges that this waiver is a material inducement to enter into this Agreement, that each has already relied on this waiver in entering into this Agreement, and that each will continue to rely on this waiver in their related future dealings.  Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 16(l) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.  In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

27

(m)     <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(n)     <u>Descriptive Headings; Interpretation; No Strict Construction</u>.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement.  Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns, pronouns, and verbs shall include the plural and vice versa.  Reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and, if applicable, hereof.  The words "include", "includes" or "including" in this Agreement shall be deemed to be followed by "without limitation".  The use of the words "or," "either" or "any" shall not be exclusive.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  All references to laws, rules, regulations and forms in this Agreement shall be deemed to be references to such laws, rules, regulations and forms, as amended from time to time or, to the extent replaced, the comparable successor thereto in effect at the time.  All references to agencies, self-regulatory organizations or governmental entities in this Agreement shall be deemed to be references to the comparable successors thereto from time to time.

(o)     <u>Entire Agreement</u>. This Agreement and any certificates, documents, instruments and writings that are delivered pursuant hereto, constitutes the entire agreement and understanding of the parties in respect of the subject matter hereof and supersedes all prior understandings, agreements or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof.

(p)     <u>Limitation on Subsequent Registration Rights</u>.  The Company shall not, without prior written consent of the Holders of a majority of the Registrable Securities, enter into any agreement with any current or future holder of any securities of the Company that would allow such current or future holder to require the Company to include securities in any registration statement filed by the Company for a period of two (2) years from the Plan Effective Date.

(q)     <u>Termination</u>. The obligations of the Company and of any Holder, other than those obligations contained in <u>Section 111</u> and this <u>Section 166</u>, shall terminate with respect to the Company and such Holder as soon as such Holder no longer beneficially owns any Registrable Securities.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

28

#4826-8994-0026

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

**CHAPARRAL ENERGY, INC.**

By: _____

Name:

Title:

#4826-8994-0026

IN WITNESS WHEREOF, the undersigned parties have executed this Registration Rights Agreement as of the date first written above.

HOLDERS:

**[Holder Name]**

By:_____
Name:
Title:

☐   By checking this box, the Holder signing above hereby requests the inclusion of all of its Registrable Securities in the Initial Shelf Registration Statement.

☐   By checking this box, the Holder signing above hereby requests the inclusion of _____ of its Registrable Securities in the Initial Shelf Registration Statement, constituting less than all of its Registrable Securities.